## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| Peter A. Kaminski,<br>                    Plaintiff,<br><br>vs.<br><br>Unum Life Insurance Company of<br>America,<br>                    Defendant. | **Case No.: 19-CV-01997-SRN-DTS**<br><br><br>**PLAINTIFF'S MEMORANDUM IN<br>SUPPORT OF HIS MOTION FOR<br>SUMMARY JUDGMENT** |

## INTRODUCTION

Plaintiff challenges Defendant's decision to deny his claims for long-term disability ("LTD") and life waiver of premium for disability ("LWOP") benefits.[1] The standard of review this Court should apply to the LTD claim is *de novo* because the Minnesota Legislature's adoption of Minn. Stat. §60A.42 prohibits disability policies which contain language compelling deferential judicial review. The standard of judicial review this Court should apply to the LWOP

---

[1] LWOP is a feature of a life insurance benefit plan whereby the insurer agrees to continue life insurance benefits for a disabled employee, without the payment of premium, during the period of disablement up to a designated end point. *See generally Bowers v. Life Ins. Co. of North America*, 21 F. Supp. 3d 993, 997 (D. Minn. 2014)(describing LWOP).

claim is significantly reduced deference under the *Woo* sliding-scale[2] because Defendant failed to evaluate the LWOP claim and is not entitled to deference over a "decision" without analysis or independent thought.

On the merits, Defendant 's denial of the LTD and LWOP benefit claims does not hold up under any standard of review. After thorough review, Defendant found Plaintiff disabled under the short-term disability ("STD") benefit plan for the full 180-days of STD benefit entitlement. But when Defendant was asked whether Plaintiff was disabled during the same 180-day period for purposes of the LTD and LWOP benefit plans, Defendant said no. What changed? The same records were reviewed. The same 180-day period was at issue. The definition of disability for purposes of STD, LTD, and LWOP was functionally identical. The only thing that changed was who would pay. The employer paid for STD benefits, but Defendant owed for LTD and LWOP benefits.

In this circuit: ***"[u]nless information available to an insurer 'alters in some significant way;' [the] previous payments of benefits 'must weigh***

---

[2] *Woo v. Deluxe Check Corp.,* 144 F.3d 1157, 1160-61 (8th Cir. 1998)(the reviewing court decreases the deference given to the plan or insurer in proportion to the seriousness of the procedural irregularity demonstrated by the plan's claims decision process).

***against the propriety of an insurer's decision to discontinue those***

***payments.'"*** [3] There is nothing that happened between approval of STD

benefits and denial of LTD/LWOP benefits that changed the facts governing

Plaintiff's disability claim.  Plaintiff remained disabled.  Plaintiff's evidence was

the same.  Defendant's LTD consultant's contrary opinions were grounded in

plainly incorrect information and misunderstanding.  Defendant's decisions

should not be upheld.

## STATEMENT OF FACTS

### *Relevant Employee Benefit Plans*

Plaintiff Peter A. Kaminski was employed by Land O'Lakes, Inc. ("LOL")

beginning 5/26/09[4] and his last day of work was 10/24/16.[5] Kaminski

participated in the STD, LTD, and life plans sponsored by LOL.[6]

---

[3] *McOsker v. Paul Revere Life Ins. Co.,* 279 F.3d 586, 589 (8th Cir. 2002)(*cited in Christoff v. UNUM Life Ins. Co. of America,* 2019 WL 4757884 (D. Minn. 9/30/19)).

[4] LTD file at 5, 306, 452.  The administrative record is in multiple files designated as the LTD, STD, and LWOP files.  Plaintiff will refer to the record by the type of benefit and page number, *i.e.* "LTD at 5" for page 5 of the LTD file.

[5] LTD at 5, 11, 394.

[6] Complaint at ¶5; LTD at 2-3, 5-6, 11-12; STD at 32.

## *The STD Plan*

The STD plan was sponsored and funded by LOL.[7]  Defendant UNUM Life Insurance Company of America ("UNUM") was the Claims Administrator meaning that UNUM made the benefit decisions pursuant to an Administrative Services Only contract and LOL paid the STD benefits.[8]  STD benefits were payable after a seven day Waiting Period and extended up to a maximum of 180-days of disability.[9]  UNUM claims administration  determined Kaminski's date of disability was 10/25/16, his waiting period ended 11/1/16, and his maximum period of STD benefits would run through 4/22/17.[10]

The definition of disability for the STD plan was:

> You are considered Disabled under this Plan if the Claims Administrator (in its sole discretion) determines that:
>
> --You are limited from performing the material and substantial duties of your occupation with the Employer due to your sickness, injury[,] or pregnancy; and

---

[7] STD at 148.

[8] Complaint at ¶6; STD at 7, 148, 151.

[9] STD at 141-42.

[10] STD at 5, 10.

--You have a 20% or more loss in regular per payroll period Covered Earnings due to that same Sickness, Injury[,] or pregnancy.[11]

### *The LTD Plan*

The LTD plan was sponsored by LOL but was "*fully insured*" by UNUM under group policy 99345-002.[12]  UNUM was the decision-maker and benefit-funder while LOL was the policyholder.  To be entitled to LTD benefits, a claimant had to be disabled for the duration of the policy's 180-day Elimination Period.[13]  UNUM's LTD staff calculated the end of the LTD Elimination Period to be 4/22/17.[14]

The LTD policy's basic benefit provided for 50% of monthly earnings up to a maximum of $10,000.[15]  Kaminski's monthly LTD benefit would have been $2,969.38.[16]

The definition of disability for the LTD plan was:

---

[11] Complaint at ¶43; STD at 151.

[12] Complaint at ¶7; LTD at 2, 7, 341-89.

[13] LTD at 11-12, 357.

[14] LTD at 11-12.

[15] LTD at 11-12; 27; 345.  There was an option for an enhanced benefit amount, but Kaminski did not elect it.  LTD at 404.

[16] LTD at 445-46.

[For the first 24 months of disability] You are disabled when Unum determines that:

--you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and

--you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.[17]

The LTD policy contained discretion-granting language as follows:

The Plan, acting through the Plan Administrator, delegates to UNUM and its affiliate UNUM Group discretionary authority to make benefit determinations under the Plan . . .

Once you are deemed to have exhausted your appeal rights under the Plan, you have the right to seek court review under section 502(a) of ERISA of any benefit determines with which you disagree. The court will determine the standard of review it will apply in evaluating those decisions.[18]

The LTD policy was issued to LOL in Arden Hills, Minnesota, making Minnesota law the choice of law.[19] The policy was originally issued 1/1/13,

---

[17] Complaint at ¶47; LTD at 357.

[18] LTD at 384 (emphasis added).

[19] LTD at 342, 377.

6

with annual anniversary dates each January.[20] Through Amendment No. 3, however, the LTD policy was amended and replaced in full as of May 1, 2016.[21]

### *LWOP/Life Insurance Plan*

The life policy was a fully insured product under group policy 99345-003.[22] The basic life policy provided for a death benefit of one year's salary rounded up to the nearest thousand.[23]  Kaminski's death benefit was $72,000.[24]

To access the LWOP, a claimant had to provide UNUM with written proof of disability after the end of the Elimination Period.[25]  The Elimination Period was the 180-day period of "*continuous disability which must be satisfied before you are eligible to have your life premium waived by UNUM.*"[26]

The definition of disability for the LWOP was:

You are disabled when UNUM determines that:

---

[20] LTD at 342-44.

[21] LTD at 341.

[22] LWOP at 24-103.

[23] LWOP at 9, 29.

[24] LWOP at 9.

[25] LWOP at 38.

[26] LWOP at 28, 66, 88.

--during the elimination period, you are not working in any occupation due to your injury or sickness; and

--after the elimination period, due to the same injury or sickness, you are unable to perform the duties of any gainful occupation for which you are reasonably suited by training, education[,] or experience.[27]

The life policy was subject to the laws of the State of Maine.[28] The policy was originally issued 1/1/13 with annual anniversary dates each January. By Amendment No. 15 the life policy was amended and replaced in full as of 1/6/17.[29] The life policy had discretion-granting language which was identical to the discretionary language set out above for the LTD policy.[30]

### Diving Accident in 2008

Kaminski suffered a terrible injury in the summer of 2008 when he was home from college for the summer. On 8/17/08, he dove into Lake Minnetonka and fractured his cervical spine at C-5.[31] His injuries were classified as an American Spinal Injury Association ("ASIA") Impairment Scale D tetraplegia. [32]

---

[27] Complaint at ¶67; LWOP at 67.

[28] LWOP at 25.

[29] LWOP at 24.

[30] LWOP at 99.

[31] Complaint at ¶11; LTD at 395, 589, 626, 642, 650.

[32] Complaint at ¶12; LTD at 589, 626.

Kaminski underwent a cervical fusion at C4-5 at North Memorial Hospital to stabilize his condition.[33] He suffered 2-3 months of neurogenic bowel and bladder.[34]  He had intensive rehabilitation care at the spinal injury program of Craig Hospital in Denver, Colorado.[35]  The result was that Plaintiff missed only one semester of college and was able to graduate in 2010 from the University of Colorado at Boulder with a degree in environmental science.[36]

But the accident caused permanent nerve damage to his cervical spine as demonstrated on MRI studies from 2012 and 2015.[37]  The nerve damage caused ongoing chronic pain issues for Kaminski.[38]

---

[33] Complaint at ¶14; LTD at 106, 650.

[34] LTD at 106, 642.  "A spinal cord injury sometimes interrupts communication between the brain and the nerves in the spinal cord that control bladder and bowel function. This can cause bladder and bowel dysfunction known as neurogenic bladder or neurogenic bowel."  https://www.mayoclinic.org/tests-procedures/neurogenic-bladder-bowel-management/about/pac-20394763 (consulted 8-9-20).

[35] Complaint at ¶15, LTD at 650.

[36] *Id.*

[37] LTD at 109, 336.

[38] LTD at 106.

Starting in 2009, Kaminski was provided with a veritable "cookie jar" of narcotic pain medications.[39]   At that time, this was thought to be the best defense against irreversible and progressive spinal cord damage because the medical community in 2009 was largely ignorant of the addictive, rebounding and suicidal risks of these drugs.[40]  But gradually the adverse effects of opioid dependence became known.  Kaminski also learned that opioids were not helpful and often harmful for him.[41]  The prescription records that UNUM ordered show that from 2010-2015 Kaminski was given numerous prescriptions for Hydrocodone, Tramadol, and Oxycodone by many providers.[42]  By 2015 Kaminski had had enough of opioids, declining this pain management approach.[43]

During Kaminski's tenure at LOL, he was promoted four times.[44] Unsurprisingly, his duties and job stresses increased with these promotions

---

[39] LTD at 643.

[40] *Id.*

[41] LTD at 104, 106, 520, 524, 590, 594.

[42] LTD at 419-35.

[43] LTD at 104, 106, 520, 524, 590, 594.

[44] LTD at 451-52.

such that by June of 2015, he was sitting at his desk working on the computer approximately 9 hours a day.[45] Being sedentary "*greatly contributed to his pain*."[46] He had to stop working and he and his father returned to the Craig Hospital in Colorado for a full evaluation.[47] Their goal was to find a way that Kaminski would "*not be in so much pain.*"[48]

The team at Craig Hospital included a physical therapist, an occupational therapist, a neurology nurse practitioner, a consulting neurologist, and a neurosurgeon.[49] The takeaway was that surgery was not an option.[50] Conservative pain management was recommended with short-term use of the medications Skelaxin and Baclofen and Neurontin, Lyrica or Cymbalta for deafferentation pain..[51] He was also recommended to do manual therapy, yoga, pool therapy, and acupuncture.[52] Most importantly, the team endorsed

---

[45] Complaint at ¶21, LTD at 589, 672.

[46] LTD at 589.

[47] Complaint at ¶21, LTD at 589, 672.

[48] LTD at 626, 629.

[49] LTD at 588-631.

[50] LTD at 601.

[51] *Id.*

[52] LTD at 595-96, 628, 629.

switching jobs so that Kaminski was not sitting all day "*and could be more active but not so active that it causes great fatigue*."[53]  However, in the short-term, the team recommended a STD leave followed by a gradual return to part-time work.[54]

*2015 Disability Benefit Claims with UNUM*

Kaminski remained on STD for the full 180-days of STD entitlement from 6/16/15 through 12/5/16.[55]  UNUM also paid Kaminski for an additional five and a half weeks of LTD after the end of STD.[56]

Kaminski returned to work full- time on 1/18/16.[57]  But he did so with accommodations from his employer which allowed him to perform his job part-time from home.[58]

---

[53] LTD at 594, 596, 597.

[54] LTD at 596.

[55] Complaint at ¶22; LTD at 672.

[56] Complaint at ¶23; LTD at 672.

[57] LTD at 672.

[58] LTD at 86, 90, 95, 98.

*2016 STD Benefit Claim*

Unfortunately, Kaminski's symptoms worsened in the summer of 2016 and he was referred to Physical Medicine and Rehabilitation physician, Dr. Leela Engineer.[59]  Dr. Engineer recommended that Kaminski stop working as of September 19, 2016 and file for STD benefits.[60]  Kaminski delayed stopping work until he "*couldn't take the pain anymore*," on October 24, 2016.[61]

A claim for STD benefits was submitted to UNUM.[62]  Unum claims administration reviewed the medical form submitted by Dr. Engineer,[63] consulted with Dr. Engineer's office staff,[64] interviewed Kaminski,[65] obtained employment information from LOL,[66] collected additional office notes from Dr. Engineer,[67] and determined that Kaminski was entitled to STD benefits for an

---

[59] LTD at 104-110.

[60] LTD at 110, 394.

[61] LTD at 394, 404; STD at 12, 53, 88.

[62] STD at 2, 34, 44-45.

[63] STD at 44-45.

[64] STD at 77.

[65] STD at 52, 57, 88-89.

[66] STD at 58.

[67] STD 102-06.

initial period of 11/1/16 through 11/21/16.[68] Thereafter, UNUM claims administration approved extensions of STD benefits through 12/5/16,[69] 12/14/16,[70] 2/14/17,[71] and the maximum STD date of 4/22/17.[72]

In approving these extensions, UNUM claims administration had multiple additional interviews with Kaminski,[73] investigated Kaminski's online activities,[74] requested additional medical records,[75] reviewed copious records from: Kaminski's mental health providers,[76] his physical and occupational therapists, his primary care provider, and Dr. Engineer[77] spanning 1/18/16 to

---

[68] STD at 92-94.

[69] STD at 109-11.

[70] STD at 120-22.

[71] STD at 280-82.

[72] STD at 563, 567, 571-72.

[73] STD at 99, 164, 179, 185, 194, 211, 218-19, 284, 543, 557.

[74] STD at 196-201. The online investigation showed nothing.

[75] STD at 214-16, 548, 555, 563.

[76] Between 2016 and 2017, Kaminski treated with psychiatrist, Sandra Quinn. LTD at 86-100, 112-115,126-29, 136-39. Additionally, he had visits with a rehabilitation/pain psychologist, Benjamin Greenberg, in early 2017. LTD at 59-64, 65-71, 135, 138, 142, 161. Kaminski's mental health issues are not disabling him. LTD at 411.

[77] STD at 360-448, 454-56.

3/29/17.[78]  UNUM's STD staff also obtained and reviewed medical records from Kaminski's evaluation at the Craig Hospital in 2015.[79]

Additionally, UNUM claims administration conducted four roundtable reviews (RTR's) concerning Kaminski's STD claim with members of its clinical, vocational, and benefits staff on: 1/23/17; 2/6/17; 3/20/17; and 3/28/17.[80] On 4/4/17, UNUM's Nurse Carole Long spoke with Dr. Engineer's office and concluded that Kaminski was entitled to STD benefits through 4/22/17.[81]

In short, the 2016 STD claim was thoroughly evaluated.  Based on this comprehensive assessment, UNUM's STD claims administration concluded Kaminski was disabled from his job until STD benefits were exhausted on 4/22/17.

### *2016 LTD/LWOP Benefit Claims*

On 4/5/17, the STD file was "rolled over" from the STD to the LTD departments at UNUM.[82] UNUM's LTD claims representative, Ashley Phillips,

---

[78] *Id.*

[79] STD 259-71.

[80] STD at 16.  *See also* STD at 187-89, 272-73, 468, 524-25.

[81] STD at 11, 563.

[82] LTD at 34-35.

was assigned.[83] On 4/11/17, she interviewed Kaminski who reported that the pain from the accident never went away and had been worsening over the 7 years he worked at LOL. Kaminski reported pain in his neck, arms, legs, and shoulders. He told Ms. Phillips that the pain affected his sleep and some days he was unable to get out of bed. Kaminski reported that his dog now lived with his parents because he was unable to care for it and that his parents did his food shopping.[84]

UNUM's LTD team reviewed Kaminski's Job Description provided by LOL.[85] The job title was "Sr. Sourcing Analyst/Buyer" and the job was categorized as a "senior" level position with responsibility for sourcing approximately 60 million in spending and savings support responsibility for 1-3 million per year.[86] UNUM concluded the job was sedentary.[87] But in defining the job, UNUM acknowledged that it was performed "mostly sitting."[88] Later

---

[83] LTD at 36-42.

[84] LTD at 394-400.

[85] LTD at 408.

[86] *Id.*

[87] LTD at 498.

[88] LTD at 498-99.

UNUM acknowledged that the job would require the ability to type frequently (up to 2/3 of a day) to enter data and prepare reports. [89]

On 4/26/17, Ms. Phillips told Kaminski UNUM needed medical records for his care after 4/22/17 (the end of the elimination period).[90]  The records arrived on 5/16/17[91] and Ms. Phillips wrote Kaminski UNUM would require 30-days to review it.[92]

On 5/22/17, Kaminski and his father called Ms. Phillips.[93]  Kaminski's father queried why UNUM needed more time to decide the claim when his son's situation had not changed in the past year.[94]  Ms. Phillips acknowledged that the only new information was Dr. Engineer's office note from 4/26/17.[95] Kaminski's father pressed Ms. Phillips to explain why his son had been found disabled for purposes of the STD policy, but UNUM was dallying with whether

---

[89] LTD at 718.

[90] LTD at 454.

[91] LTD at 487.

[92] LTD at 494-96.

[93] LTD at 503-04.

[94] *Id.*

[95] *Id.*

he satisfied the Elimination Period for the LTD policy.[96] Ms. Phillips responded,

wrongly, that the LTD Elimination Period was longer than the STD period.[97]

Dr. Engineer's office note for 4/26/17 can be summarized as follows:

**Chief Complaint:** Chronic neck pain, bilateral arm and neck pain, neuropathic pain.

Patient is here for follow-up visit. Last seen by me 4 weeks ago for acupuncture treatment. . . . *"Overall, his symptoms are the same and there has been no significant change since I last saw him."* He has been swimming every other day and feels this is helpful though does have significant pain when not in the pool. Has ongoing fatigue and insomnia. He continues to work with psychology and psychiatry. Takes Lyrica at 50 mg three times a day.

**Pain:**

| | |
|---|---|
| Pain location: | Neck. Diffuse pain bilateral arms and legs. |
| Pain severity: | 8/10 |
| Timing: | Constant with intermittent worsening |
| Pain quality: | Dull, aching, sharp, stabbing |
| Pain trend: | "*Staying the same*" |
| Pain aggravating factors: | Sitting, standing, lifting, jarring |
| Pain alleviating factors: | Swimming, medications. Acupuncture (some pain relief also makes him feel more relaxed).[98] |

---

[96] LTD at 504.

[97] *Id.*

[98] LTD at 484-86 (emphasis added by underlining).

CASE 0:19-cv-01997-SRN-DTS    Doc. 25    Filed 08/10/20    Page 19 of 57

In short, the 4/26/17 stated that there had been no significant change in Kaminski's condition and his pain was "staying the same."

Dr. James Folkening,[99] a UNUM physician, called Dr. Engineer to discuss Kaminski's case.[100]  Dr. Folkening remarked that Kaminski had taken a trip to Europe in late 2016, was walking his dog, bicycling, swimming, and driving which did not seem consistent with the inability to tolerate a sedentary job.[101]

Dr. Engineer responded Kaminski was someone who would force himself to try to stay active, but he would certainly not be pain free in doing so. Moreover, he would often be quite fatigued after any such activity.[102]  Dr. Engineer advised Dr. Folkening that she had just seen Kaminski on 5/23/17 and referred him to a new pain clinic.[103]

Dr. Folkening wrote in the claim file that Dr. Engineer's opinion was not "credible" and recommended reviewing the 5/23/17 office note and then issuing a final decision without records from the new pain clinic referral

---

[99] Dr. Folkening is an internal medicine physician.  LTD at 526, 529-30.

[100] LTD at 511-12, 514.

[101] *Id.* at 514.

[102] *Id.*

[103] *Id.*

because this was "*not critical information that should further delay indicated action for the claim*."[104]

Dr. Engineer sent in her office notes of the 5/23/17 visit as well as a letter supporting disability.[105]   The 5/24/17 office note can be summarized as follows:

> **Chief Complaint**: Low Back Pain. Chronic neck pain, bilateral arm and neck pain, neuropathic pain.
>
> Patient here for follow-up.   A few weeks ago, on 5/8/17, was helping Mom lift something and had acute onset of severe LBP. Severe pain and could not stand up straight.   Went to ER at Westhealth and was prescribed Medrol Dosepak and Norco and Valium. It was thought pain was muscular strain.  He feels that pain is improving and that meds were helpful.  Has been participating in OT lifestyle renewal program and also doing PT—both land and pool. Which helps low back pain.
>
> <u>He does continue to have chronic neuropathic pain related to his spinal cord injury</u>. Frustrated with delay on LTD approval.  <u>Has ongoing fatigue and insomnia. Diffuse pain in the arms and legs bilaterally.</u>   Continues to work with psychology and psychiatry Continues on Lyrica 50 mg 3 times a day which he feels is somewhat helpful.   Does not take Baclofen as he says it is not helpful and causes tremor in his arms.
>
> **Pain:**
> Location:                           Low back centrally.   Neck.  *<u>Diffuse pain bilateral arms and legs, unchanged since recent onset of low back pain.</u>*

---

[104] LTD at 515.

[105] LTD at 517-524.

| Severity: | 7-9/10 |
| Timing: | Constant with intermittent worsening. |
| Quality: | Dull, aching, burning |
| Trend: | _Chronic neuropathic pain staying the same,_ low back pain gradually improving. |
| Aggravating factors: | Sitting, standing, lifting, jarring, bending, twisting, running. |
| Alleviating factors: | Swimming, Medications.  Acupuncture (Some pain relief also helps feel more relaxed).  Heat, icing.  Resting. PT. |

**Assessment**: Acute low back pain.  Lumbar strain. Chronic neck pain.  Status post cervical fusion.  Cervical spinal cord injury, sequelae.  Neuropathic pain.

**Plan:** Continue PT and OT for both chronic neuropathic and acute low back pain.  Continue swimming/pool exercises.  Meds:  Gave him a  refill on Valium for short-term use as he felt this was more helpful than baclofen.  Do not recommend Valium for long-term use.  Referred to chronic pain clinic, Twin Cities Pain Clinic for chronic neuropathic pain which remains significant and has been ongoing despite therapies.  He was on narcotic pain meds in the past but this caused cognitive and other issues and he does not wish to resume taking narcotics.  He may be a candidate for a spinal cord stimulator or other interventions.  Follow-up in 8 weeks.

"_He remains unable to work at this time doing even sedentary work due to his chronic pain and fatigue._"[106]

Thus, Dr. Engineer's office note of 5/24/17 showed that the only change in Kaminski's condition since his visit of 4/26/17 was that he had suffered a new injury to his low back.  As to his chronic neck, bilateral arm, and neuropathic

---

[106] LTD at 517-21 (emphasis added by underlining).

pain, the symptoms were "*staying the same*" and "*unchanged*."  Even the pain

severity ratings were in the same range.[107]

Dr. Folkening concluded that inconsistencies in the medical records

showed Kaminski was capable of a sedentary, full-time job.[108]  UNUM referred

the claim Dr. Alan Neuren[109] who concurred with Dr. Folkening that Kaminski

was able to do activities that were inconsistent with a sub-sedentary work

capacity.[110]

Relying on the opinions of Drs. Folkening and Neuren, UNUM denied

Kaminski's claim.[111]  However, in making that decision, **UNUM did not do any**

**of the following**:

(1) Call Kaminski and ask about the allegedly inconsistent activities;

(2) Call the occupational therapist who made the notation that Kaminski
      had been walking dogs 5-7 miles a day to confirm whether there was
      a transcriptional error in the note;[112]

---

[107] *Compare* LTD 484 *with* LTD 518.

[108] LTD at 526-30.

[109] Dr. Neuren is a neurology and psychiatry physician.  LTD at 532-33.

[110] LTD at 532.

[111] LTD at 542-46.

[112] LTD at 117; STD at 396.

(3) Arrange to have surveillance done to document the allegedly inconsistent activities;

(4) Request that Kaminski attend an independent medical examination;

(5) Attempt to explain the inconsistency between the decision made by UNUM's STD and LTD departments regarding disablement for the 180-day Elimination Period; or

(6) Gather any other medical records such as updated PT, OT, or pain clinic records.

The LWOP file is only 196 pages long[113] and contains only Dr. Engineer's office notes for 4/26/17[114] and 5/24/17[115] and her letter of 5/24/17[116] for medical records. The LWOP file does not even contain UNUM's two physician consultant's reports.[117] The LWOP department's decision was simply that since the LTD department concluded Kaminski could perform a sedentary job, *"it is*

---

[113] LWOP at 1-196.

[114] LWOP 137-39.

[115] LWOP 145-57.

[116] LWOP at 151.

[117] LWOP at 1-196.

*reasonable for LWOP to close for not [Totally disabled] own occ.*"[118]  The LWOP

denial letter largely parroted the LTD denial letter.[119]

### *Appeal to UNUM*

Kaminski retained Attorney Diana Young Morrissey to appeal to UNUM

from the LTD/LWOP decisions.[120]  Ms. Morrissey submitted a 75 page appeal

on 12/29/17.[121]  Included were: (1) more detailed records from Kaminski's

treatment in 2015 at Craig Hospital;[122] (2) an extensive critique of UNUM's

decision-making;[123] and (3) a Physical Abilities Test ("PAT") report by Physical

Therapist, John Hovde.[124]

UNUM sent Kaminski's records for review by Dr. Linda Cowell.[125]  Dr.

Cowell acknowledged Kaminski had permanent spinal cord injuries that

---

[118] LWOP at 11.

[119] *Compare* LTD at 542-46 *with* LWOP at 154-58.

[120] LTD at 559.

[121] LTD and 588-648.

[122] LTD at 335-36, 588-602.

[123] LTD at 640-48.

[124] LTD at 649-57.

[125] LTD at 710-13.  Dr. Cowell was listed as a specialist in neurology and psychiatry

manifested in symptoms at and below the C-5 level which would require lifelong treatment and work modifications.[126]  But, she opined that Kaminski's pain could not be so bad because he no longer required narcotic analgesics.[127] Accordingly, Kaminski could perform a full-time sedentary job so long as he had the opportunity to stand for five minutes every hour.[128] Then Dr. Cowell commented on Kaminski's use of medical marijuana and a DWI arrest from 2015.[129]

In an addendum to her report, Dr. Cowell was asked about upper extremity work.  Dr. Cowell acknowledged that the PAT testing showed that Kaminski's ability to type was slow and effortful and would likely require some type of adaptive assistance.[130]  She also acknowledged that UNUM's vocational expert opined that Kaminski's job would require the ability to keyboard 2/3 of the time.[131]  Yet, without any explanation, Dr. Cowell concluded that "*it would*

---

[126] LTD at 712.

[127] *Id.*

[128] LTD at 710-13.

[129] LTD at 713.

[130] LTD at 720-21.

[131] *Id.*

*be expected*" Kaminski could perform the keyboarding required of his job.[132]

UNUM denied the appeal of LTD/LWOP based on Dr. Cowell's opinions.[133]

<u>Disability Opinions Supporting Kaminski</u>

Dr. Engineer consistently opined that Kaminski could not perform full-time, sedentary work even with the opportunity for position changes.

| Provider | Date | Content |
|---|---|---|
| Dr. Engineer | 10/3/16 | <u>Restrictions and/or Limitations:</u><br>*"He is not able to sit or stand for any significant length of time due to severe chronic pain in his neck, bilateral arms & legs and is therefore unable to do even sedentary work at this time."*<br><u>Duration:</u><br>9/19/16 – ??? duration unknown likely at least 2 months or more[134] |
| Dr. Engineer | 2/1/17 | **Are you continuing to advise your patient to remain out of work beyond December 14, 2016?** *Yes*<br><br>**What are the specific physical and/or cognitive findings on which you are basing your decision?** *He has severe neck upper and lower extremity pain as well as significant fatigue, due to which he is not able to stand or sit for any significant length of time and unable to do even sedentary work.* |

---

[132] *Id.*

[133] LTD at 728-737.

[134] LTD at 317; STD at 45.

|  |  | **What are the patient's current restrictions and limitations…?** *Unable to sit or stand more than 30 minutes. Not able to do lifting greater than 10 pounds more than occasionally.*<br><br>**On what date do you expect your patient will be able to return to work?** *Unknown. Will need to be off work at least 4 more months (through 6/1/17).*[135] |
|---|---|---|
| Dr. Engineer | 3/29/17 | *"[He] has a history of Spinal cord injury with chronic neuropathic pain. He has extended periods of nerve pain in the neck, upper and lower extremities, which can be worsened with any significant sitting or standing at his desk. He also has significant insomnia and fatigue. These symptoms make it difficult for him to do his job at this time. He also has depression and anxiety which also impact his ability to do his job. He is currently undergoing therapies to help improve his symptoms."*[136] |
| Dr. Engineer | 5/24/17 | *" [He] has a history of spinal cord injury with chronic neuropathic pain since 2008. His nerve pain has been significantly worse for the past couple of years, particularly over the past year. He has chronic nerve pain in the neck, upper and lower extremities, which can be worsened with any significant sitting or standing. He also has significant insomnia and fatigue. Due to these symptoms, he is unable to do his regular job. . . . He has been participating in physical therapy, both land and pool-based PT, as well as occupational therapy and has been taking medications as prescribed but is having ongoing* |

---

[135] LTD at 232-33; STD at 214-15.

[136] LTD at 45; STD at 555.

| | | |
|---|---|---|
| | | *symptoms which continue to be severe. I do not anticipate any significant improvement in his pain level and activity tolerance in the near future, and therefore do not think he will be able to return to work in the near future. He also has depression and anxiety which also impact his ability to do his job.*"[137] |
| Dr. Engineer | 5/25/17 | Responding to Dr. Folkening, Dr. Engineer opined that Kaminski could not sustain working 6-8 hours a day—even in a sedentary job allowing for periodic position changes.[138] |

On appeal Kaminski submitted a Physical Abilities Test (PAT) report from PT John Hovde. [139]  The PAT was conducted on 12/11/17 and measured Kaminski's physical abilities to perform work.  PT Hovde found that Kaminski presented with widespread sensory impairment, impaired balance and coordination, and upper extremity and lower extremity clonus.[140] On the pinch test, Kaminski showed valid genuine effort.[141] Kaminski did poorly on a variety

---

[137] LTD at 524.

[138] LTD at 514.

[139] LTD at 650-58.

[140] LTD at 651. "Clonus is a type of neurological condition that creates involuntary muscle contractions. This results in uncontrollable, rhythmic, shaking movements." https://www.healthline.com/health/clonus downloaded 8/10/20.

[141] LTD at 652.

of the tests related to upper extremity dexterity due to finger shakiness.[142]  He

walked well below average normal speed.[143] On tests for stumbling, Kaminski's

scores showed mild gait impairment.[144]

Kaminski performed typing testing and was able to type 25 wpm over a

period of four minutes.[145] Mr. Hovde noted that the most important observation

he made of Kaminski was that he suffered from impaired dexterity and clonus

in his wrists and forearms that impairs finger/hand dexterity. [146]   Mr. Hovde

summarized Kaminski's ability to perform repetitive hand activities as "*slow,*

*inefficient, self-paced hand use.*"[147]

<u>*Disability Opinions from UNUM*</u>

On 4/4/17, UNUM's STD nurse spoke with Dr. Engineer's office and

concluded as follows:

> *[B]ased on Ee dealing with chronic nerve pain that limits his ability*
> *to be in one position for more than 10-15 min. need for constant*
> *stretching, and fatigue from limited sleep due to pain, and given EE*
> *has [history of] traumatic spinal cord injury that required multi level*

---

[142] LTD at 653.

[143] LTD at 654.

[144] LTD at 654.

[145] LTD at 655.

[146] LTD at 656.

[147] LTD at 658.

*fusion, [Restrictions and Limitations] related to concentration, standing/sitting are appropriate.* [148]

However, shortly thereafter, UNUM's view changed 180°. UNUM's doctors[149] determined Kaminski was not disabled during the period STD benefits were paid because unspecified medical records showed he was swimming, biking, walking dogs 5-7 miles a day, driving, and traveling.

Biking: The biking reference appears to relate to a note from 1/31/17 that Kaminski rides his bicycle for exercise, but he is sensitive to the angle he sits.[150] There is nothing more than that.

Swimming: The references to using a pool for therapy are replete in Kaminski's records. For instance, during his 2015 assessment in Colorado, Kaminski reported swimming at his parents' pool was therapeutic for him.[151] The team recommended he continue to do so.[152]

_____

[148] STD at 11, 563.

[149] LTD at 526-30; 532.

[150] LTD at 62; STD at 507.

[151] LTD 589; 627.

[152] LTD at 596.

Kaminski reported to Dr. Engineer and his OT in 2016 that doing pool exercises at his parents' pool was helpful.[153]  He continued to report that this was helpful to Dr. Engineer.[154]  Dr. Engineer encouraged this and even referred him for formal aquatic therapy which he did.[155]

Walking dogs 5-7 miles:  This stems from a notation in the OT's assessment from 10/4/16 where she recorded that Kaminski walked dogs 5-7 miles.[156]  Kaminski argued this must have been a mistype of 5-7 **minutes** a day.[157]  PT Hovde agreed that based on the PAT study, walking 5-7 miles a day was inconsistent with tested abilities and Kaminski's history.[158]

The reference to walking dogs 5-7 miles a day in the 10/4/16 OT note is also internally inconsistent.  In the same note, the OT writes that Kaminski lives alone in an apartment and that his dog stays with his parents mostly.[159] Indeed

---

[153] LTD at 106; 116.

[154] LTD at 163; 484.

[155] LTD at 149; 155; 486; 520.

[156] LTD at 117; STD at 396.

[157] LTD at 645.

[158] LTD at 656.

[159] LTD at 117; STD at 396.

later in April of 2017, Kaminski was so impaired that he told both the STD and LTD staff his dog was staying with his parents again because he could not care for the dog.[160]

Moreover, the idea that Kaminski could regularly walk dogs 5-7 miles a day was inconsistent with the OT's overall conclusion that Kaminski had severe limitations in his activities and abilities and required an extended OT treatment plan.[161]

Driving: It is unclear what the reference to driving means in UNUM's consultant's reports. Kaminski acknowledged that he could drive[162] but that sitting in a car caused discomfort.[163] He reported to his providers that driving aggravated his condition[164] and sometimes inhibited his ability to get out.[165]

Travel: Kaminski's medical records reflect that he had a planned trip to Europe for October of 2016.[166] He was able to go with his family, but the plane

---

[160] LTD at 397; STD at 558.

[161] LTD at 119-20; STD at 398-400.

[162] LTD at 397.

[163] LTD at 395.

[164] LTD at 155-156; STD at 434-35.

[165] LTD at 151; STD at 430.

[166] LTD at 112; STD at 391.

ride and activity were extremely uncomfortable and fatiguing.[167]  There is also

a reference to Kaminski going to his family's cabin in Michigan where the cold

caused him issues.[168]

Both references are contained in records from his OT from late 2016 and

do not change her overall recommendation that Kaminski required ongoing OT

as well as additional medical interventions.[169]

## ARGUMENT

I.    THIS COURT SHOULD APPLY *DE NOVO* REVIEW TO UNUM'S DECISION
      ON THE LTD BENEFITS.

Customarily in an ERISA benefits dispute, if the policy contains "explicit

discretion-granting language,"[170] the court will review the insurer's decision

deferentially and reverse only for an abuse of discretion.[171]  UNUM's LTD policy

contains discretion-granting language.  However, this case presents a question

of first impression that alters this framework.  As of 1/1/16, Minnesota Statute

---

[167] LTD at 130; STD at 339.

[168] *Id.*

[169] *Id.*

[170] *McKeehan v. CIGNA Life Ins. Co.,* 344 F.3d 789, 793 (8th Cir. 2003).

[171] *Zaeske v. Liberty Life Assur. Co. of Boston,* 901 F.3d 944, 948 (8th Cir. 2018);
*See also Frerichs v. Hartford Life and Accid. Ins. Co.,* 875 F. Supp. 2d 923, 938 n.3
(D. Minn. 2012).

§60A.42, prohibits disability policies from including discretion-granting language:

> No policy, contract, certificate, or agreement offered or issued in this state providing for disability income protection coverage may contain a provision purporting to reserve discretion to the insurer to interpret the terms of the contract or provide a standard of review that is inconsistent with the law of this state, or less favorable to the enrollee when a claim is denied than a preponderance of the evidence standard.

Minn. Stat. §60A.42 (emphasis added).   Under these circumstances, the standard of review this Court applies to the LTD claim should be *de novo*.

A.   A Brief History of Discretion-Granting Language and ERISA Disputes.

To understand how Minn. Stat. §60A.42 fits into the landscape of ERISA benefits litigation, a brief history is helpful.[172]   When Congress adopted the Employee Retirement Income Security Act of 1974 ("ERISA"), it did not set out

---

[172] *See Davis v. UNUM Life Ins. Co. of America*, 2016 WL 1118258 at *2-4 (E.D. Ark. 3/26/18)(setting out the historical context in which states banned discretion-granting language in insurance policies in response to federal court decisions applying deference under ERISA).   *See also* Radha A. Pathak, "*Discretionary Clause Bans & ERISA Preemption*," 56 S.D. L. REV. 500 (2011); John Morrison and Jonathan McDonald, "*Exorcising Discretion: The Death of Caprice in ERISA Claims Handling,*" 56 S.D. L. REV. 482 (2011), *but see* Joshua Foster, *"ERISA, Trust Law, and the Appropriate Standard of Review: A De Novo Review of Why the Elimination of Discretionary Clauses Would Be an Abuse of Discretion*," 82 ST. JOHN'S L. REV. 735 (2008).

34

the standard of review courts should apply when deciding a benefits due dispute.[173]  In *Firestone Tire & Rubber Co. v. Bruch*,[174] the Supreme Court held the default standard of review would be *de novo* <u>unless</u> the plan document explicitly granted the plan fiduciary discretionary authority to decide claims in which case abuse of discretion review would apply.[175]

Following *Firestone,* plans/insurers included discretion-granting language in their plans/policies precisely so that challenges to benefit decisions would be reviewed under the lenient abuse of discretion standard of review.[176] The Eighth Circuit Court applied abuse of discretion (or its equivalent arbitrary and capricious review) to the benefit disputes that arose.[177]

---

[173] 29 U.S. C. §1132(a)(1)(B).

[174] 489 U.S. 101 (1989).

[175] *Id.* at 112-15.

[176] *See Davis v. UNUM,* 2016 WL 1118258 at *3.

[177] *Compare Da Pron v. Spire Missouri, Inc.,* 963 F.3d 836, 838 (8th Cir. 2020); *with Cox v. Mid-America Dairymen Inc.,* 965 F.3d 565, 571 (8th Cir. 1992). **<u>NOTE</u>:** Sometimes the Eighth Circuit refers to the standard of review as arbitrary and capricious, but these formulations is interchangeable with abuse of discretion. *Schatz v. Mutual of Omaha Ins. Co.,* 220 F.3d 944, 946 n.4 (8th Cir. 2000).

Starting in 2002, however, the National Association of Insurance Commissioners ("NAIC") promulgated a Model Act entitled: "PROHIBITION ON THE USE OF DISCRETIONARY CLAUSES MODEL ACT," urging states to adopt legislation that disallows or limits such clauses in health or disability policies.[178]  Presently 24 states, including Minnesota, have done so either by legislation or administrative action.[179]

---

[178] *See Davis v. UNUM,* 2016 WL 1118258 at *3.

[179]

| AK | (https://www.commerce.alaska.gov/web/portals/11/pub/RatesAndForms/Group_Health_Checklist.pdf;  and  Alaska Statutes § 21.42.130; 21.36; 21.12.050 |
|---|---|
| AR | Arkansas Admin. Code 054.00.101-4 (2013) |
| CA | Cal. Ins. Code § 10110.6 |
| CO | Colo. Rev. Stat. § 10-3-1116 |
| CT | (Bulletin HC- 67 ) http://www.ct.gov/cid/lib/cid/BullHC-67.pdf; |
| HI | § 431:13-102 |
| ID | IDAPA 18.01.29.003 |
| IL | 50 Ill. Adm. Code 2001.3 |
| IN | https://www.in.gov/idoi/files/Bulletin_103.pdf (Bulletin 103) |
| KY | KRS 304.13-130(1)(b)); Advisory Opinions 2008-05 & 2010-01http://insurance.ky.gov/Documents/discrclausesadvopin2010_01.pdf; |
| ME | Me. Rev. Stat. tit. 24-A, § 4303(health discretionary ban); 24-A M.R.S.A.  §2847-V (group disability discretionary ban) |
| MD | Md. Code Ann. Ins. §12-211 |
| MI | Mich. Admin. Code R. 500.2202 |

In federal court, these state discretionary language limitations have been upheld against claims of ERISA preemption.[180]  The Sixth, Seventh, and Ninth Circuits have all held state bans on discretionary clauses are not preempted by ERISA.[181]  The Tenth Circuit equivocated at first, suggesting such a ban would

| MN | Minn. Stat. § 62Q.107 (health policies); Minn. Stat. § 60A.42 (disability policies) |
|----|-----|
| MT | Mont. Code Ann. § 33-1-502 |
| NH | New Hampshire Insurance Regulation Ins 401:03(l) |
| NJ | N.J.A.C. 11:4-58(1-4) |
| OR | OAR 836-010-0026 |
| RI | R.I. Gen. Laws §§ 27-18-79 |
| SD | S.D. Admin. R. 20:06:52:02 |
| TX | Tex. Ins. Code § 1701.062; 28 Tex. Admin. Code §§ 3.1201-03 |
| UT | Utah Code Ann. §31A-21-314 |
| WA | Wash. Admin. Code § 284-44-015 |
| WY | Wyo. Stat. § 26-13-301 |

[180] *See generally* Radha A. Pathak, "*Discretionary Clause Bans & ERISA Preemption*," 56 S.D. L. Rev. 500 (2011).

[181] *American Council of Life Insurers v. Ross*, 558 F.3d 600, 606 (6th Cir. 2009)(Michigan insurance rules banning marketing of policies with discretionary language are not preempted by ERISA); *Fontaine v. Metropolitan Life Ins. Co.,* 800 F.3d 883, 889 (7th Cir. 2015)(Illinois ban on discretionary clauses is not preempted); *Standard Ins. Co. v. Morrison*, 584 F.3d 837, 845 (9th Cir. 2009)(Montana ban on discretionary clauses is not preempted).

be preempted,[182] but just last month the Tenth Circuit indicated a ban on discretionary language in insured policies might not be preempted.[183] The Eighth Circuit has not addressed this question.[184] But the district court in South Dakota recently held that the Eighth Circuit would follow the trend and conclude a discretionary ban is not preempted by ERISA.[185]

### B. Minnesota Has Banned Discretion-Granting Language in Disability Policies Issued or Renewed on or After 1/1/16.

The Minnesota ban on discretionary clauses in disability policies[186] was adopted during the 2015 legislative session, applies to policies issued or renewed after 1/1/16 in Minnesota, and was codified at Minn. Stat. §60A.42.[187] It prohibits policy language:

---

[182] *Hancock v. Metropolitan Life Ins. Co.,* 590 F.3d 1141, 1149 (10th Cir. 2009)(Utah discretionary ban).

[183] *Ellis v. Liberty Life Assur. Co. of Boston*, 958 F.3d 1271, 1279 (10th Cir. 2020)(Colorado discretionary ban).

[184] *Johnson v. Wellmark of South Dakota, Inc*., 441 F. Supp. 3d 780, 792 (D.S.D. 2020).

[185] *Id.* at 793 (holding South Dakota's ban on discretionary clauses in insured policies is not preempted).

[186] Minnesota also has a ban on discretionary clauses in health insurance policies that was adopted in 1998*. See* Minn. Stat §62Q.107; Minn. Laws 1998, ch. 407, art. 2, sec. 21.

[187] "This section is effective January 1, 2016 and applies to policies issued or renewed on or after that date." Minn. Laws 2015, ch. 59, sec. 1. Although it was

*purporting to reserve discretion to the insurer to interpret the terms
of the contract or provide a standard of review that is inconsistent
with the law of this state, or less favorable to the enrollee when a
claim is denied than a preponderance of the evidence standard.*[188]

The UNUM LTD policy was issued to LOL in Arden Hills, MN and the policy

specifies that Minnesota is the governing state law.  In this circuit, courts will

follow an ERISA plan's choice-of-law for the employer's state of residence

unless unreasonable or fundamentally unfair.[189]  Plainly, it is reasonable and

fair to apply Minnesota law.

C.    The UNUM LTD Policy Was Issued or Renewed After 1/1/16.

UNUM challenges application of Minn. Stat. §60A.42 on the grounds that

the LTD policy was not "issued or renewed" on or after 1/1/16.  But the policy

was amended and replaced in its entirety effective 5/1/16 thereby satisfying

the "issued or renewed" requirement.

On 5/1/16, UNUM amended and replaced the LTD policy in its entirety

and the insured, LOL acquiesced.  This activity occurred after the statutory date

---

enacted as §62A.241, it was re-designated as §60A.42 by the revisor of statutes
in St.2015 Supp.

[188] Minn. Stat. §60A.42.

[189] *Brake v. Hutchinson Technology, Inc. Group Disability Income Ins. Plan*, 774
F.3d 1193, 1197 (8th Cir. 2014)("where a choice of law is made by an ERISA
contract, it should be followed, if not unreasonable or fundamentally unfair").

of 1/1/16. Amending and replacing in entirety is the same thing as issuing or renewing a policy.

Three cases, all involving UNUM, have addressed this very issue. In *Rustad-Link v. Providence Health*,[190] the plaintiff sought *de novo* review of UNUM's denial of her LTD benefits on the grounds that the Washington state ban on discretionary clauses precluded UNUM's discretionary language from having effect. The court concluded the discretionary ban applied, in part, because there was a policy amendment prefacing the policy document which stated: "[t]he entire policy is replaced by the policy attached to this amendment," and the amendment had an effective date after the statute.[191] Hence, the very same amend and replace strategy that is present in this case was grounds for finding that the state discretionary ban applied.

Likewise, in *Jacob v. UNUM Life Ins. Co. of America*,[192] the same issue developed in connection with the Texas ban on discretionary clauses. There the UNUM policy contained an amendment which stated, "[t]he entire policy is replaced by the policy attached to this amendment."[193] The court in *Jacob*

---

[190] 306 F.Supp.3d 1224 (D. Mt. 2018).

[191] *Id.* at 1236.

**[192]** 2017 WL 4764357.

[193] *Id.* at *1.

commented that if the amendment and replacement amounted to a new policy, then the statutory requirement that the policy be issued or renewed would be satisfied.  Where, as here, the amendment amounts to replacement of the entire policy, there would be a new policy under the analysis in *Jacob.*

Finally, in *Price v. Tyson Foods*,[194] the court was asked whether the UNUM policy was impacted by adoption of the Arkansas ban on discretionary clauses. There the plaintiff argued only that the policy's anniversary date occurring after the statute effective date was sufficient.  While the court rejected that argument, it commented that had the UNUM policy amendment been after the date of the statute, that would have amounted to issuance or renewal and triggered application of the Arkansas statutory ban.[195]

What all three of these decisions demonstrate is that where UNUM has unilaterally amended and replaced its policy, this amounts to issuance or renewal of a policy for purposes of triggering application of a state discretionary ban.  By amending and replacing the LTD policy in its entirety, UNUM has not just altered an existing policy, it has replaced the policy.

---

[194] 2017 WL 3567531 n.6 (W.D. Ark 8/17/17).

[195] *Id.*

Interpreting amend and replace to be the same as issue or renew makes sense as a matter of ordinary language usage as well.  Dictionary definitions of the word "replace," all support the idea that a new item is being put in the place of an old item.  For example, according to Merriam-Webster's online dictionary, replace means:  ". . . **2:**to take the place of especially as a substitute or successor **3:**to put something new in the place of."[196]     Likewise, Dictionary.com defines "replace" as: "to assume the former role, position, or function of; substitute for (a person or thing): . . . to provide a substitute or equivalent in the place of.[197]

UNUM's LTD policy was amended and replaced in its entirety as of May 1, 2016 and the insured, LOL agreed to the amendment and replacement.  This is issuance or renewal of a policy and triggers the Minnesota discretionary ban statute.  This Court should apply *de novo* review to the LTD claim.

II.     THIS COURT SHOULD APPLY SLIDING SCALE REDUCED DEFERENCE TO REVIEW OF UNUM'S DECISION ON THE LWOP CLAIM.

UNUM's decision on the LWOP claim should be reviewed with sliding scale reduced deference due to the lack of an actual decision-making process

---

[196]     https://www.merriam-webster.com/dictionary/replace     downloaded 8/3/20.

[197] https://www.dictionary.com/browse/replace downloaded on 8/10/20.

on the LWOP claim.  That is, because of the absence of decision-making on the LWOP claim, this Court should reduce any deference in accord with the sliding scale reduced deference authorized *Woo v. Deluxe Check Corp.*[198]

Ordinarily, the LWOP claim would be subject to abuse of discretion review because the life policy contains discretion-granting language.  And while the life policy is subject to the laws of the State of Maine, and that state has adopted a discretion-ban for disability policies, the ban went into effective after Plaintiff's disability.[199]

But abuse of discretion judicial review is not proper when the insurer has committed a serious procedural irregularity that is connected to the decision reached.  That is, *Woo* sliding scale reduced deference standard is proper when the claimant offers material, probative evidence demonstrating that:

 (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to her [or him] and shows that "the conflict or procedural irregularity has 'some connection to the substantive decision reached.'"[200]

---

[198] 144 F.3d 1157 (8th Cir. 1998).

[199] See 24-A M.R.S.A.  §2847-V, effective 9/19/19, 2019 Maine Laws ch. 179, sec. 2.

[200] *Woo,* at 1161-62 (*citing Buttram v. Central States,* 76 F.3d 900; *Layes v. Mead Corp.,* 132 F.3d 1246, 1250 (8th Cir. 1998))(emphasis added).
The conflict of interest prong of the *Woo* test has been abrogated by the Supreme Court's intervening decision in *Glenn v. Metropolitan Life Ins. Co.,* 554

The Eighth Circuit has been clear that an insurer owes a duty to give a reasoned analysis of the claim and the evidence.[201] Furthermore, a claims decision-maker is obliged to exercise independent judgment. The Court in *Buttram v. Central States,* for example, observed that where there is evidence that the plan failed to exercise independent judgment which affected the decision, this would be a serious procedural irregularity.[202]

As applied to the LWOP decision, UNUM's initial claim and appeal decision processes were woefully lacking in principled decision-making. The LWOP claim file contains only two medical records: the 4/26/17 and 5/24/17

U.S. 105, 115-16 (2008). However, the procedural irregularity prong of *Woo* still stands. *See Leirer v. Proctor & Gamble Disability Benefit Plan,* 910 F.3d 392, 396 (8th Cir. 2018); *Boyd v. ConAgra Foods, Inc.,* 879 F.3d 314, 320 (8th Cir. 2018); *Waldoch v. Medtronic, Inc.,* 757 F. 3d 822, 831 n.3 (8th Cir. 2014); *Wade v. Aetna Life Ins. Co.,* 684 F.3d 1360, 1362 n.2 (8th Cir. 2012); and *Wrenn v. Principal Life Ins. Co.,* 636 F.3d 921, 924 n.6 (8th Cir. 2011)(all holding that *Glenn* decision abrogated only the conflict of interest prong of *Woo* test).

[201] *See Richardson v. Central States, Southeast and Southwest Area Pension Plans,* 645 F.2d 660, 664-65 (8th Cir. 1981).

[202] *See Buttram v. Central States, Southeast and Southwest Area Pension Plans*, 76 F.3d 896, 900 (8th Cir. 1996).

office notes from Dr. Engineer, and her letter of 5/24/17. In comparison, the LTD and STD claim files have substantial medical records from a host of different providers who have treated Plaintiff.

The LWOP file does not even contain the reports from UNUM's doctors. The LWOP decision-maker apparently simply relied on UNUM's LTD denial letter—borrowing heavily from that letter—to support its "decision." Moreover, there are no notes showing that the LWOP case was handled as anything other than a "me-too" echo of the LTD decision-maker. Minimally, this Court should apply highly reduced deference to the decision made by the LWOP decision-makers.

III.    <u>UNUM'S DECISION TO DENY THE BENEFIT CLAIMS CANNOT BE SUSTAINED UNDER EVEN A DEFERENTIAL STANDARD OF REVIEW</u>

The following analysis looks at the merits of UNUM's decisions. However, rather than do this exercise twice (once applying *de novo* and once applying abuse of discretion review), we will look at it under the more deferential standard of review. For, if the decision would be an abuse of discretion; it follows naturally that it would fail *de novo* review.

Under the abuse of discretion standard, a claims fiduciary's decision must be reasonable. Whether the decision was reasonable depends on whether it is

supported by substantial evidence.[203]   Substantial evidence is "more than a mere scintilla."[204]  "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[205]    A fiduciary's decision is reasonable if a reasonable person could have reached a similar decision, given the evidence in the record, not whether the reasonable person would have reached that decision.[206]   In determining whether a decision is reasonable, courts consider whether the decision is "supported by substantial evidence that is assessed by its quantity and quality."[207]

   A.    <u>UNUM's Decision Was Unreasonable Where There Was No Evidence of a Change in Kaminski's Condition for the Better.</u>

   In a case where the claims fiduciary terminates benefits after paying for some time and there is no evidence of a change in the claimant's condition for the better, termination is unreasonable.  In *McOsker v. Paul Revere Life Ins. Co.,*[208] the Eighth Circuit observed that it was important to consider what

---

[203] *Cash v. Wal–Mart Group Health Plan,* 107 F.3d 637, 641 (8th Cir.1997).

[204] *Fletcher–Merrit v. NorAm Energy Corp.,* 250 F.3d 1174, 1179 (8th Cir.2001).

[205] *Id.*

[206] *Cash*, 107 F. 3d at 641.

[207] *Torres v. UNUM Life Ins. Co. of America,* 405 F.3d 670, 680 (8th Cir.2005).

**[208]** 279 F.3d 586 (8th Cir. 2004).

happened between when the decision was made to pay benefits and when the

decision was made to terminate.[209]

> *We are not suggesting that paying benefits operates forever as an estoppel so that an insurer can never change its mind; <u>but unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments.</u>*[210]

What this means is that there should be evidence of a change in the information

about the claimant before a decision to terminate will be reasonable.[211]  As a

result, where a claimant is approved for benefits by UNUM but then is reviewed

again a short while later with no apparent change in condition prompting the

re-review, this can weigh heavily against a finding that the new review

determination is justified.[212]

---

[209] *Id.* at 590.

[210] *Id.* at 589 (emphasis added).

[211] *See Smith v. Johnson and Johnson Disability Retirement Income Benefit Plan*, 2010 WL 1417969 *6-8 (E.D. Ark. 3/31/10); *Hairston v. Loctite Corp.*, 2006 WL 568326*8 (W.D. Ark. 3/7/06).

[212] *See e.g. Christoff v. UNUM Life Ins. Co. of America*, 2019 WL 4757884 *8 (D. Minn. 9/30/19)(observing "the brief period between the last time that Christoff's claim was approved, paired with the very recent analyses of his medical records that considered up-to-date submissions regarding his activities and his doctors' assessments, heavily weigh[s] against the propriety of Unum's latest review of Christoff's benefits").

When there is a roll-over from STD to LTD and the same entity is making the decisions, this presents a *McOsker* situation where there needs to be some rationale for a different decision.  For example, the federal court in Minnesota has held that where the same insurer decided claims for STD and LTD benefits and the claimant was held entitled to STD benefits for the entire period of STD, the insurer would be precluded from claiming that the claimant was not disabled for the entire LTD waiting period.[213]  More recently, the court in California held that where the same insurer pays STD but then denies LTD based on the same medical evidence, this discredits the LTD insurer's decision.[214]

Here there is nothing to explain why UNUM made a different decision on STD and LTD/LWOP.  First, there is no evidence that Kaminski underwent a change for the better at or about the time that the LTD/LWOP benefits were denied.  Indeed, quite the opposite is true.  In her 4/26/17 office note Dr. Engineer writes that his condition is the same.  When she wrote her next note

---

[213]*Fordyce v. Life Ins. Co. of North America,* 340 F. Supp. 2d 994, 1007 (D. Minn. 2004).

[214] *Elliott v. Life Ins. Co. of North America*, 2019 WL 2970843 at *7 (N.D. Cal. 7/9/19).

on 5/24/17, Kaminski's condition had worsened by an intervening low back injury. Otherwise the condition was the same.

Thus, there was nothing to show improvement in Kaminski's situation at the time of the roll over. Furthermore, the period at issue, the 180-day Elimination Period was the same for STD and LTD/LWOP. The evaluators looked at the same records (except for the notes from 4/26/17 and 5/24/17). When pressed how UNUM could pay STD but dither over LTD, UNUM falsely said the two periods were not the same.

UNUM offers no explanation for such a complete turn-about. A review of the records shows only that the payer changed. While LOL paid STD, UNUM would pay for LTD and LWOP. If that is the only reason that a different decision was reached on the very same evidence, this would establish that the insurer's financial conflict of interest impacted its decision-making process. Such a situation is a factor to be considered in finding UNUM's conduct to be an abuse of discretion.[215]

B.     UNUM'S Reliance on its Consultant's Opinions Was Unreasonable.

UNUM's decisions relied entirely on the opinions of its reviewers: Drs. Folkening, Neuren, and Cowell. This reliance was unreasonable for four

---

[215] *Glenn v. Metropolitan Life Ins. Co.,* 554 U.S. 105, 115-16 (2008).

reasons. These opinions: (1) relied on alleged "inconsistencies" while making no effort to investigate or evaluate them; (2) ignored evidence supportive of Kaminski without explanation; (3) penalized Kaminski for choosing to avoid pain control with narcotics; and (4) improperly injected prejudicial information into the decision-making process.

"Review of an administrator's decision under an abuse of discretion standard, though deferential, is not tantamount to rubber-stamping the result. On the contrary, [courts] review the decision for reasonableness, which requires that it be supported by substantial evidence that is assessed by its quantity and quality."[216] Thus, a decision will not be reasonable where it relies on innuendo or inference that is exaggerated.[217] Furthermore, failure to probe into relevant matters will be an abuse of discretion.[218] An insurer is not permitted to rely on a paper reviewer's report without considering if its

---

[216] *Torres v. UNUM Life Ins. Co. of America,* 405 F.3d 670, 680 (8th Cir. 2005).

[217] *Torres,* 405 F.3d at 681 (finding UNUM's conduct in taking a private letter apologizing about a drinking incident and through unsupported repetition of this fact growing it into an alcohol abuse problem).

[218] *Torres*, 405 at 681-82(finding UNUM's failure to probe into relevant issue of the vocational demands of his job an abuse of discretion).

conclusions flow logically from the underlying medical evidence.[219]  It is an abuse of discretion to misconstrue or misstate evidence.[220]Finally, where there is evidence that the claimant is engaging in activities such as light stretching or going to the gym which his physician has recommended, it is an abuse of discretion to rely upon this to deny benefits.[221]

### 1.    **Improper Reliance on Alleged Inconsistencies.**

UNUM's reviewers rely almost entirely on alleged inconsistencies between Kaminski's activities and work capacity.  This reliance is unreasonable because these "inconsistencies" are either not inconsistent, plainly wrong, or exaggerated.

Swimming was not inconsistent with Kaminski's condition.  All of Kaminski's providers from 2015 forward recommended that he swim; as it was beneficial for him.  The providers even sent Kaminski to aquatic therapy in addition to the swimming he did at his parents' home.  It would be an abuse of

---

[219] *Willcox v. Liberty Life Assur Co. of Boston*, 552 F.3d 693, 700-01 (8th Cir. 2009).

[220] *Frerichs v. Hartford Life and Accid. Ins. Co.*, 875 F. Supp. 2d 923, 940 (D. Minn. 2012).

[221] *Morgan v. UNUM Life Ins. Co. of America*, 346 F.3d 1173, 1178 (8th Cir. 2003).

discretion to use Kaminski's adherence to medically recommended exercise to find him able to work.

Walking dogs 5-7 miles a day was quite obviously a transcriptional error by the OT who wrote it. It was inconsistent with other parts of the same note by the OT. It was contradicted by what was in UNUM's notes. It was grossly out of proportion to Kaminski's reported activities. Yet, when a simple call to Kaminski, Dr. Engineer, or the OT could have cleared this up, UNUM did nothing. UNUM preferred to grasp this stray comment and turn it into a great inconsistency. This is not how a fiduciary operates and it is an abuse of discretion to act in this manner.

UNUM took one reference to "biking" and gave it credence without any attempt to clarify the extent, frequency, or duration of such an activity. All that was written was that Kaminski rides his bicycle for exercise; but is sensitive to the angle he sits. Yet, UNUM did nothing to ascertain what this meant. UNUM could have asked Kaminsky or the doctor who recorded the note what it meant. Yet rather than get to the bottom of the comment, UNUM chose to turn this into an adverse fact.

But it could well be that biking was a minimal or limited activity. One can say that one goes biking and mean that occasionally each summer he/she rides around Lake Harriet. It could also mean that one is training for the Tour

de France.  But UNUM did nothing to clarify what this meant.  UNUM just drew the most adverse inference and held it against Kaminski.  Even if he did some biking, that would certainly not be inconsistent with the goal to remain active.

Traveling and driving is UNUM's other alleged inconsistency.  What the medical records say about driving is that Kaminski could drive but found it difficult—and sometimes impossible.  That is not proof of the ability to work full-time.  Furthermore, that Kaminski went with his family on a planned trip to Europe ignores the rest of the reference where Kaminski reported that he found the plane trip difficult and the beds uncomfortable.  Taking a trip that is a "one off" is not proof that Kaminski could work.[222]  Kaminski was likely committed to the trip with his family and decided to go forward with it.  But that does not mean he able to work full-time.

### 2.    Ignored Evidence Supportive of Kaminsky Without Explanation.

While an insurer need not give special weight to the opinion of a treating physician, it must not "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."[223] In this case, UNUM's reviewers ignored evidence supportive of Kaminsky with explanation for

---

[222] *Frerichs*, 875 F. Supp. 2d at 948.

[223] *Black and Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).

disregarding the evidence.  The most obvious example of this is Dr. Folkening's conclusion after speaking with Dr. Engineer that he finds her opinion not credible.  But Dr. Folkening offers nothing to support this conclusion.  Why was she not credible?  Dr. Engineer had been treating Kaminski for several months on a regular basis.  She had his records.  She had examined him, treated him, prescribed medication, and therapies for him.  She had an in-person and longitudinal view of his medical situation.

Furthermore, Dr. Engineer was in the type of medical specialty appropriate for Kaminski's issues.   She was a Physical Medicine and Rehabilitation doctor (also called a physiatrist). The Craig Hospital team had told Kaminski that the appropriate provider for his condition was this type of provider.

Dr. Cowell also ignored evidence favorable to Kaminsky without explanation.  When presented with the PAT report showing how Kaminsky's ability to type—a skill required for 2/3's of his work—was slow and effortful—Dr. Cowell disregarded the PAT evidence.  Instead she just concluded without explanation that "it would be expected" he could still perform his job on a full-time basis.

Ignoring inconvenient evidence or simply calling it not credible is not the work of a fiduciary doing its job.  It is an abuse of discretion.

3.   **Penalized Kaminski for choosing to avoid pain control with narcotics.**

UNUM's Dr. Cowell penalized Kaminski for choosing to avoid the use of narcotics.  She opined that Kaminski's pain could not be so bad because he no longer required narcotic analgesics.  But the record is clear that Kaminski was not using narcotics because he had made a choice to pursue a non-narcotic approach to pain control.

The medical evidence was quite clear that Kaminski was able to function up until 2015 in large part because he was using substantial amounts of narcotics to control pain.  When he discovered that this was harmful to himself and ineffective, Kaminski wisely chose to stop this course of action.  Dr. Cowell ignored Kaminski made a personal choice to cease using opioids.  His prudent choice should not be misconstrued and used against him when pain continued to bedevil him.

injected prejudicial information into the decision-making process.

4.   **Injected Prejudicial Information into the Decision-Making Process**.

Finally, Dr. Cowell injected prejudicial and irrelevant information into the decision-making process.  In *Torres*, the Eighth Circuit chastised UNUM for allowing irrelevant and prejudicial information about an episode of drinking to

become part of a benefits decision where alcohol abuse was not at issue. Dr. Cowell did something similar here.

In her report, Dr. Cowell opined on the fact that Kaminski had started to use medical marijuana and had had a DWI in 2015. Apparently, she did so as part of making a mental health disability analysis. But UNUM already had clarified with Kaminski's mental health provider that there was no claim for disability due to mental health conditions. Nevertheless, UNUM permitted Dr. Cowell to offer bring up irrelevant and prejudicial facts under the guise of commenting on mental health. This is the type of conduct that was of concern in *Torres*. Bringing up the medical marijuana and a past DWI tainted the opinion and should have caused UNUM to reject it.

## **CONCLUSION**

For the reasons set forth above, Kaminski asks that this Court to find that UNUM's decisions to deny his claims for LTD and LWOP benefits were not sustainable and Order UNUM to pay retroactive LTD benefits, reinstate Kaminski into coverage under the life plan, commence paying LTD monthly benefits going forward, commence waiving life premiums going forward, and order the payment of attorneys fees and costs to Kaminski following submission of appropriate proof thereof.

Dated: <u>August 10, 2020</u>

By: <u>S:/Katherine L. MacKinnon</u>
Katherine L. MacKinnon (#170926)
Nicolet Y. Lyon (#0391954)
LAW OFFICE OF KATHERINE L. MACKINNON, P.L.L.C.
2356 University Ave W. Ste. 230
(952) 915-9215 (ph)
(952) 915-9217 (fax)
kate@katemackinnon.com
nicolet@katemackinnon.com
***Counsel for Plaintiff Peter A. Kaminski***