# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Peter A. Kaminski, | Case No. 0:19-cv-1997 (SRN/DTS) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| UNUM Life Insurance Company of America, | ***Filed Under Seal*** |
| | Unsealed 2/5/2021 |
| Defendant. | |

Katherine L. MacKinnon and Nicolet Lyon, Law Office of Katherine L. MacKinnon, 2356 University Ave. W., #230, St. Paul, MN 55114, for Plaintiff.

Christopher J. Haugen and Terrance J. Wagener, Messerli & Kramer, P.A., 100 S. 5th St., 1400 5th St. Towers, Minneapolis, MN 55402, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

Plaintiff Peter A. Kaminski brings this lawsuit against Defendant UNUM Life Insurance Company of American ("Unum"), challenging the denial of long-term disability ("LTD") and life waiver of premium benefits ("LWOP") under an employer-sponsored insurance plan governed by the Employee Retirement Income Security Act ("ERISA"). Before the Court are the parties' cross motions for summary judgment [Doc. Nos. 17 & 23]. For the reasons set forth below, Defendant's Motion for Summary Judgment is denied, and Plaintiff's Motion for Summary Judgment is granted.

Kaminski was employed by Land O'Lakes ("LOL") starting on May 26, 2009, and

last worked for the company on  October 24, 2016.  (Long-Term Disability File ("LTD") at 5, 11, 306, 394, 452.)[1]   During his employment with LOL, Kaminski worked full-time in a variety of positions, concluding his employment as a senior sourcing analyst/buyer. (Compl. [Doc. No. 1] ¶ 16; LTD at 451–52.)  He participated in the employee benefit plans offered by LOL, which included Group Disability Insurance Policy No. 99345-002 (the "Policy"), issued by Unum,  (LTD at 2–3, 5–6, 11–12; Short-Term Disability File ("STD") at 32), and Life Insurance Policy No. 99345-003 (containing the "LWOP Provision"), also issued by Unum. (LWOP at 24–103.)

Kaminski received STD benefits under the Policy, discussed in greater detail below, during the following two time periods:  (1) June 16, 2015 through December 5, 2015 (*see* LTD at 596); and (2) November 1, 2016 through April 22, 2017.  (STD at 563, 567, 571–72.) On April 5, 2017, Kaminski's STD file transferred to Unum's LTD department.  (LTD at 34–35; 338.)  Following a review, Unum denied Plaintiff's LTD claim on May 31, 2017.  (LTD at 542–46.)  Kaminski filed an appeal on December 29, 2017, which included more detailed medical records from Kaminski's 2015 treatment for chronic pain at Craig Hospital as well as the results of a physical abilities test.  (LTD at 587–667.)  On February 9, 2018, Unum denied Kaminski's appeal.  (LTD at 727–36.)

---

[1]    All citations to the administrative record are to Exhibits A, B, and C of the Declaration of Celeste Godbout [Doc. No. 20].  Exhibit A is a copy of Unum's short-term disability file (referred to herein as "STD"), Exhibit B is a copy of the non-privileged portion of Unum's long-term disability file ("LTD"), and Exhibit C is a copy of Unum's life waiver of premium file ("LWOP"). The Bates-stamped pages within these exhibits are preceded by a series of letters, (e.g., "UA-CL-LTD"), which the Court eliminates here, and page numbers are cited solely by the last digits, without preceding digits (e.g., "00000").

On July 29, 2019, Kaminski commenced this lawsuit under ERISA, 29 U.S.C. § 1132(a)(1)(B), seeking the payment of LTD benefits under ERISA, as well as LWOP benefits.[2] (Compl. ¶¶ 49–52.)  The parties have filed cross motions for summary judgment.

## I. BACKGROUND

### A. Benefit Policies

#### 1. The Policy

The LTD Policy bears an "effective date" of January 1, 2013, and has an annual "anniversary date" of January 1.  (LTD at 342.)  On May 1, 2016, the Policy was amended, although no part of the policy was in fact changed.  (LTD at 341.)  Instead, the amendment read: "The entire policy is replaced by the policy attached to this amendment."  (*Id.*)

The Policy delegates to Unum "discretionary authority to make benefit determinations under the Plan . . . .  Benefit determinations include eligibility for benefits and the amount of any benefits, resolving factual disputes, and interpreting and enforcing provisions of the Plan. All benefit determinations must be reasonable and based on the terms of the Plan and the facts and circumstances of each claim."  (LTD at 384.)

With respect to LTD benefits, the Policy provides as follows:

How does Unum Define Disability?

You are disabled when Unum determines that:

- you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and

---

[2]     Under an LWOP feature of a life insurance benefit plan, the insurer typically agrees to continue to provide life insurance benefits for a disabled employee, without payment of premiums, during the period of disability, up to a designated end date.  *See Bowers v. Life Ins. Co. of N. Am.*, 21 F. Supp. 3d 993, 997 (D. Minn. 2014).

- you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

- After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training, or experience.

(LTD at 357.)

The Policy defines "material and substantial duties" as duties that "are normally required for the performance of your regular occupation; and cannot be reasonably omitted or modified." (LTD at 373.) "Regular occupation" under the Policy "means the occupation you are routinely performing when your disability begins. Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location." (LTD at 375.) "Gainful occupation" is defined as "an occupation that is or can be expected to provide you with an income at least equal to 80% of your indexed monthly earnings within 12 months of your return to work." (LTD at 373.)

To qualify for LTD benefits under the Policy, a claimant was required to be disabled for the duration of the Policy's 180-day elimination period. (LTD at 357.)

As applicable here, the Policy's basic LTD benefit was for 50% of monthly earnings, up to a maximum of $10,000. (LTD at 345.) Kaminsky's monthly LTD benefit payment would have been $2,969.48. (LTD at 445–46.)

### 2. The LWOP Benefit

To obtain the LWOP benefit offered in LOL's life insurance policy, a claimant was

required to provide Unum with written proof of disability after the end of an elimination period of 180 days. (LWOP at 28.) To obtain the LWOP benefit, Unum defined "disability" as follows:

> You are disabled when Unum determines that:
>
> - during the elimination period, you are not working in any occupation due to your **injury** or **sickness**; and
>
> - after the elimination period, due to the same injury or sickness, you are unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by training, education, or experience.

(LWOP at 67) (emphasis in original). The life insurance policy was subject to the laws of the state of Maine. (LWOP at 25.)

The life insurance policy was originally issued on January 1, 2013, with an annual anniversary date on January 1. (LWOP at 25.) On January 6, 2017, the life insurance policy was amended, although no part of the policy was in fact changed. (LWOP at 24.) Instead, it read: "The entire Summary of Benefits is replaced by the Summary of Benefits attached to this amendment." (LWOP at 24.) As with LTD benefits, the life insurance policy contained language vesting Unum with discretion to make benefit determinations. (LWOP at 99.)

### B. History of Spinal Cord Injury and Medical Care

When Kaminski was home from college in the summer of 2008, he was seriously injured in a diving accident on Lake Minnetonka. (LTD at 395, 589, 626, 642, 650.) He suffered a spinal cord injury, fracturing his cervical spine at C-5, which resulted in paralysis for a period of time. (*Id.*) Kaminski underwent a cervical fusion at C4-5 at North Memorial Hospital in Robbinsdale, Minnesota, and later underwent intensive rehabilitation and care at

the spinal injury program of Craig Hospital in Denver, Colorado.  (LTD at 106, 642, 650.)

His condition improved significantly, and within ten months, he was walking and had

increasing use of his arms.  (LTD at 649.)  Despite impairments to his gait and the use of his

hands, Kaminski graduated from the University of Colorado with a bachelor's degree in

environmental science.  (LTD at 397, 650.)  He eventually recovered his strength almost

completely, but experienced ongoing issues with chronic pain.  (LTD at 106.)

As noted, Kaminski began working for LOL on May 26, 2009.  (LTD at 5, 11, 306,

394, 452.)  During his tenure at LOL, Kaminski received four promotions, culminating in his

position as a senior sourcing analyst/buyer.  (LTD at 451–52.)

## 1.   June 2015 to January 2016

By June 2015, Kaminski's work duties involved sitting at a desk for approximately

nine hours a day.  (LTD at 588.)   At that time, he reported neck pain, muscle spasms,

insomnia, anxiety, and depression.  (LTD at 588, 598.)  He applied for STD benefits.  (*Id.*)

In July 2015, Kaminski returned to Craig Hospital in Denver for an interdisciplinary

evaluation for neuropathic pain, as well as secondary symptoms of anxiety and depression.

(LTD at 598–636.)  He met with a physical therapist, occupational therapist, neurology nurse

practitioner, consulting neurologist, and neurosurgeon.   (LTD at 588–601.)   The

neurosurgeon performed a cervical MRI, which showed mild spinal curvature, but otherwise

normal findings.  (LTD at 600–01.)  The neurosurgeon found that Kaminsky's reports of pain

were mostly musculoskeletal in nature, and therefore, surgical intervention was not

recommended.  (LTD at 600.)

Kaminski sought help with pain management from the physical and occupational

6

therapists at Craig Hospital, who noted the need for pain management, stating, "his pain is severe and debilitating and causes him to stay in bed and become depressed, anxious, and have to stop working." (LTD at 594.) He reported that the pain in his upper back and shoulder area was, at its worst, 8.5 on a 10-point scale. (*Id.*) Kaminski was advised to consider a job in which he could be more active, with the team of medical evaluators "recommend[ing] that he ha[ve] a job/position where he is more active but not so active that it causes great fatigue." (LTD at 593.) Kaminski reported that he felt better when he moved around, which he was able to do on disability leave, when he was able to walk more and swim on a daily basis. (*Id.*)

Dr. William Daft, a primary care doctor who evaluated Kaminski, noted that the medical team supported his application for STD "so that he can get better control over his pain and spasticity." (LTD at 596.) Dr. Daft further stated, "His work is a computer/desk job and sitting all day is causing his pain," and his most recent job, which was sedentary, "greatly contributed to his pain." (LTD at 588, 593.) The medical team advised that when Kaminski returned to work, he should "start part-time and ease into it very slowly." (LTD at 595.)

Kaminski and the examining medical providers also discussed adjusting his medications.[3] He reported that he was "not interested in any narcotics or muscle relaxers, as he reports most relaxers make[] him too sleepy." (*Id.*) The medical team provided a prescription for baclofen, a muscle relaxer and antispasmodic agent. (LTD at 593, 596.) The

---

[3] From 2009 through 2015, Kaminski was prescribed a number of narcotic pain medications, including Hydrocodone, Tramadol, and Oxycodone, to manage his progressively worse nerve pain. (LTD at 419–35, 513, 642, 712.) As the adverse effects of opioids became known, Kaminski declined this pain management approach. (LTD at 104, 106, 520, 524.)

occupational therapist recommended that he also try other forms of pain relief in addition to manual therapy, including transcutaneous electrical nerve stimulation (TENS), yoga, acupuncture, and meditation for chronic pain and pain relief. (*Id.*)

As noted, Kaminski applied for STD benefits pursuant to the STD Policy issued by Unum. He received the full 180 days of STD benefits from June 16, 2015 through December 5, 2015 ("the 2015 STD Benefits"). (LTD at 671.) Unum also paid Kaminski for an additional five and a half weeks of LTD benefits after the end of the 2015 STD benefits, from December 6, 2015 through January 17, 2016. (*Id.*) The file for his first LTD claim, number 11529673, for which Kaminski received benefits ending in January of 2016, is not part of the record before this Court. It appears, however, that those benefits were paid based on Kaminski's disabilities of neck pain and depression, as evidenced in notes concerning his second LTD claim, number 13341797. (*Id.*)

Kaminski returned to work on January 18, 2016. (*Id.*) He did so with accommodations from LOL that allowed him to work part-time from home, and part-time from the office. (LTD at 86, 90, 95, 98.)

Shortly thereafter, on January 28, 2016, Kaminski met with psychiatrist Sandra Quinn, M.D, for treatment of anxiety and depression. (LTD at 86.) Dr. Quinn noted that Kaminski was not in acute distress, and that he reported feeling "pretty good," and "the best he has felt over the past several months." (LTD at 86–87.) The doctor's notes indicate that Kaminski had experienced "a lot of anxiety about returning to work on January 18," but described the transition as "going well and better than expected." (LTD at 86.) He reported that he was relieved to be working again, his medications seemed to be helping, and he planned to resume

8

therapy at that time, because he "ha[d] his insurance back." (*Id.*)  Dr. Quinn prescribed
Klonopin and Zoloft for Kaminski's anxiety and depression, and planned for him to taper off
Klonopin.  (LTD at 87–88.)

Kaminski met with Dr. Quinn again in March 2016, at which time he continued to
state that he felt well overall.  (LTD at 90.)  While Kaminski reported general improvement
in his anxiety, he continued to feel anxious about "the future of his career and the unknown."
(*Id.*)  Dr. Quinn noted, "Work has been going well for him and he continues to work from
home which allows him more flexibility.  He is wondering if he should have a career change
completely or stay within the same company.  He would like to be promoted and move up in
the company although is unsure if he will be able to do that working from home."  (*Id.*)  Dr.
Quinn decreased Kaminski's Klonopin dosage at that time, and continued to prescribe Zoloft.
(LTD at 91–92.)  Kaminski treated with Dr. Quinn again in May and June 2016.  (LTD at 95–
100.)  In her June 30, 2016 treatment notes, she noted that if Zoloft ceased to be effective in
the future, she would "consider cross titrating to Cymbalta since this treats chronic pain as
well."  (LTD at 99.)

### 2.   October 2016 through March 2017

During the summer of 2016, Kaminski's symptoms worsened.  (LTD at 95, 104.)  He
was referred to a physician with a specialty in physical medicine and rehabilitation, Dr. Leela
Engineer.  (LTD at 104–10.)  Dr. Engineer is a board certified physiatrist.  (*Id.*)  Dr. Engineer
evaluated Kaminski on September 19, 2016 for his reports of chronic pain.  (LTD at 106.)
Kaminski stated that by July 2016, the medication baclofen had ceased to be effective and
caused fatigue.  (*Id.*)  At that time, he had tapered off baclofen and experienced "sharp

shooting pain in his arms and hands as well as generalized pain throughout his body." (*Id.*) Due to his worsening symptoms, he stated that he had been unable to work for the two months prior to his September appointment, and needed to apply for STD benefits. (*Id.*) Kaminski described his pain as "constant," "getting worse," and that it was aggravated by sitting, which he was required to do "most of the time at work." (*Id.*) As to any pain-alleviating factors, he indicated that heat, medications, changing positions, exercises, physical therapy, walking, and pool exercises all helped. (*Id.*)

Dr. Engineer diagnosed Kaminski with "Chronic neck pain. Status post cervical fusion. Cervical spinal cord injury, sequela. Neuropathic pain. Depression." (LTD at 110.) Among the elements of Kaminski's treatment plan, Dr. Engineer advised him to continue physical therapy, referred him to an occupational therapy "lifestyle renewal program," and recommended acupuncture treatment. (*Id.*) She also stated, "He is not able to work at this time due to pain," and noted that Kaminski would provide her with STD paperwork. (*Id.*) During their September 2016 visit, Dr. Engineer advised Kaminski to stop working. (LTD at 394.)

On September 22, 2016, Kaminski treated with Dr. Quinn for depression and anxiety. (LTD at 112.) She observed that he appeared to be in no acute distress and was appropriately dressed and groomed. (*Id.*) Kaminski reported feeling "rough" in the interval between his last visit in late June 2016. (*Id.*) He noted that he had been unable to attend a therapy appointment because he could not get out of bed. (*Id.*) He reported a significant increase in pain, and noted his pain management plans with respect to gabapentin, acupuncture, and the occupational therapy lifestyle renewal program. (*Id.*) Further, Kaminski reported an increase

in anxiety, depression, and sleep loss due to physical pain, and an incident in which he felt very weak and collapsed, requiring an ambulance.  (LTD at 112–14.)  Dr. Quinn noted, "He describes that he has nerve pain and sometimes his muscles do not relax.  He has a trip to Europe scheduled in October and hopes to be able to still go."  (LTD at 112.)  Her treatment plan was for Kaminski to transition from Zoloft to Cymbalta for mood and anxiety, as well as to possibly help with pain.  (LTD at 114.)  In addition, she recommended a chronic pain treatment program.  (*Id.*)

Kaminski met with an occupational therapist, Summer Shepstone, on October 4, 2016 for evaluation in the Park Nicollet Occupational Therapy Lifestyle Renewal Program, with the goal of "be[ing] able to function again."  (LTD at 116–21.)  Shepstone noted that Kaminsky reported "decreased function with daily activities due to nerve pain down both arms and generalized pain throughout his body as if all his muscles are tense all the time." (LTD at 117.)  Kaminski stated that "[s]itting is worse than standing and at work he was sitting up to 10 hours a day.  The more he moves the better he feels."  (*Id.*)

As for Kaminski's symptoms, Shepstone noted, "Significant fatigue, being sore all over, feeling not very strong, sometimes sharp numbing pain in arms and legs, feel like I am in a straight jacket, my whole upper body is so tight I'm so stiff, aching and nerve pain, surging and burning nerve pain, muscle spasms."  (*Id.*)  Alleviating factors were identified as "walk with dogs, baclofen worked for a bit then stopped working, movement, heat, water, swimming, being in the sun."  (*Id.*)  The medical record also noted that when experiencing mild to moderate symptoms, Kaminski reported difficulty with problem solving and decreased productivity at home and work, whereas when experiencing severe symptoms, he

11

was forced to cancel social activities, exercise, and work. (*Id.*) Kaminski noted that he lived independently, but his dog mostly stayed with his parents. (*Id.*) Describing Kaminski's "exercise routine," Shepstone stated, "mow the lawn, walk with dogs 5–7 miles, swim almost daily during the summer at [p]arents' pool. Doesn't run due to jarring causing pain in neck." (*Id.*)

Shepstone's evaluation also included the results of a Pain Self Efficacy Questionnaire ("PSEQ"), which, among other things, asked the question, "How severe is the impact of pain on your quality of life? (0-10, 0 being best)," to which Kaminski responded with "10," the most severe impact. (LTD at 118.) In her "Therapist Impression/Summary," Shepstone noted the following:

> Client is a 30 year old male who presents for occupational therapy evaluation secondary to chronic nerve pain post SCI and subsequent C4-C5 Fusion. Client's symptoms include nerve pain in the neck, upper back, low back, bilateral arms and legs. Pain severity: 4-9/10. Client's PSEQ score of 29/60 and CGI of 10/10 suggests client experiences moderate to severe disability and impact on daily functioning due to pain symptoms. Client has demonstrated a decline in ability to participate and perform daily activities secondary to symptoms.

(LTD at 119.)

Trying to "tough it out," Kaminski delayed stopping work until October 24, 2016, when he "couldn't take the pain anymore." (LTD at 394.) Dr. Engineer submitted an Attending Physician Statement on behalf of Plaintiff's STD claim. (LTD 303–04.) She gave Kaminski a primary diagnosis of chronic neck pain, with a secondary diagnosis of "neuropathic pain, cervical spinal cord injury." (LTD at 303.) Dr. Engineer provided the following restrictions and limitations on his potential ability to work: "He is not able to sit or

stand for any significant length of time due to severe chronic pain in his neck, bilateral arms and legs, and is therefore unable to do even sedentary work at this time." (LTD at 304.)  As to the duration of the restrictions, she indicated a start date of September 19, 2016, and as to the end date, stated, "duration unknown, likely at least two months more." (*Id.*)

On November 9, 2016, Unum approved Kaminski's claim for STD benefits. (STD at 92–94.)  It identified his date of disability as October 25, 2016, and approved benefits from November 1, 2016 through November 21, 2016.[4] (*Id.*)  Unum ultimately approved extensions of STD benefits through December 5, 2016, (STD at 109–11), December 14, 2016, (STD at 120–22), February 14, 2017, (STD at 280–82), and the maximum STD benefits date of April 22, 2017.[5] (STD at 563, 567, 571–72.)  In approving these extensions, Unum requested additional records, conducted interviews with Kaminski, (STD at 99, 164, 179, 185, 194, 211, 218–19, 284, 543, 557), and researched Kaminski's online profiles and comments. (STD at 196–201.)  Unum also reviewed medical records from Kaminski's mental health providers,[6] (LTD at 54–64, 65–71, 86–100, 112–15, 126–29, 135–39, 142, 161), his physical and

---

[4]     Unum's STD policy had a seven-day benefit waiting period before the receipt of benefits. (LTD at 273.)

[5]     Throughout this time, there were short periods of denial of benefits, during which time Kaminski provided additional records and information. (*See, e.g.,* LTD at 244.) Ultimately, Unum approved the extensions through the maximum STD benefits date noted above.

[6]     Between 2016 and 2017, Kaminski treated with a psychiatrist, (LTD at 86–100, 112–15, 126–29, 136–39), and, in 2017, with a rehabilitation/pain psychologist. (LTD at 59–64, 65–71, 135, 138, 142, 161.)  His mental health issues did not form the basis for his LTD claim. (LTD at 411; Pl.'s Mem. in Supp. Mot. for Summ. J. ("Pl.'s Mem.") [Doc. No. 25] at 14 n.76.)  Accordingly, the Court does not address his mental health records unless they contain information generally relevant to his LTD claim.

occupational therapists, his primary care provider, and Dr. Engineer, spanning from January 18, 2016 to March 29, 2017.  (STD at 360–448, 454–56.)  Unum's staff further reviewed the records from Kaminski's 2015 evaluation at Craig Hospital.  (STD at 259–71.)  Unum's claims administration reviewers also conducted several roundtable reviews with Unum's clinical, vocational, and benefits staff concerning Plaintiff's STD claim.  (STD at 16, 187–89, 272–73, 468, 524–25.)

Among the records that Unum reviewed in connection with these extensions was a November 7, 2016 follow-up treatment note from Dr. Engineer.  (STD 103–05.)  She noted that Kaminski's chief complaint was chronic neck pain and nerve pain.  (STD at 103.)  Her notes identified the pain location in the neck, as well as diffuse pain, bilateral in the arms and legs, with a pain severity ranging from 4 to 9 on a scale of 10.  (*Id.*)  Dr. Engineer's notes stated that the "pain trend" was "staying the same," with heat, physical therapy, walking, and resting providing some relief.  (*Id.*)  Dr. Engineer also observed that Kaminski was an "[a]lert, pleasant man in no obvious severe discomfort,"  (STD at 104), and that he "ambulate[d] with non antalgic gait."  (STD at 104–05.)  Again, she diagnosed chronic neck pain and neuropathic pain.  (STD at 105.)

Kaminski met with his psychiatrist, Dr. Quinn, on November 10, 2016.  (LTD at 126.)  Although Dr. Quinn noted that Kaminski did not appear to be in acute distress, his mood was "more down," and he exhibited a "tired" affect.  (LTD at 126–27.)  She further observed:

> Today patient describes that things have been stressful recently.  He was working up until October 25 although he has filed for short-term disability due to his chronic pain, which was approved yesterday until November 21.  He is working with his rehab physician to extend the short-term disability and titrating gabapentin dose.  He is also beginning acupuncture and the lifestyle

> renewal program. . . .  He has been feeling "so stressed" he has been taking
> Klonopin 3 times daily. . . .  His pain has remained about the same.  He
> describes [that] he is constantly worried.  He is considering different job options
> for the future.

(LTD at 126.)  Given Kaminski's high degree of stress, Dr. Quinn endorsed the use of

Klonopin.  (LTD at 128.)  She recommended a chronic pain day treatment program, continued

acupuncture treatments, and participation in the lifestyle renewal program.  (*Id.*)

Kaminski met again with occupational therapist Summer Shepstone on December 12,

2016.  (LTD at 130–32.)  During the visit, they discussed non-pharmacological pain

management strategies, including self-care/relaxation and sleep.  (LTD at 131.)

Two days later, on December 14, 2016, Kaminski met with Dr. Engineer for a follow-

up appointment and acupuncture treatment.  (LTD at 133.)  Kaminski's chief complaint

remained chronic neck pain and nerve pain.  (*Id.*)  Dr. Engineer noted the following:

> Since I last saw him, he has increased his gabapentin to 600 mg tid, but does
> not really feel this is helping.  He did have a consultation regarding medical
> marijuana, and has started this.  He is taking it at bedtime, does feel it helps him
> sleep. He feels it works better than the baclofen for sleep, and he has stopped
> the baclofen.  He has resumed the OT lifestyle renewal program, feels it is very
> helpful and is very positive about this.  He has started doing some restorative
> yoga.  He does physical therapy at Twin Cities Orthopedics for manual therapy,
> but states he is not doing this very often.  He does do home exercises and
> stretches.

(*Id.*)

Again, Dr. Engineer documented Kaminski's "pain timing" as "constant," with the

severity rated as between 7 and 9 on a 10-point scale.  (*Id.*)  She described the  "pain trend"

as "[s]taying the same or getting very slightly better."  (*Id.*)  Dr. Engineer observed that the

factors aggravating Kaminski's pain were sitting, lifting, jarring, bending, standing, twisting,

reaching, and doing housework, whereas pain-alleviating factors were heat, physical therapy, walking, and resting. (*Id.*) Her assessment of Kaminsky remained the same: "Chronic neck pain. Status post cervical fusion. Cervical spinal cord injury, sequela. Neuropathic pain." (LTD at 135.)

At a January 12, 2017 psychiatry follow-up visit with Dr. Quinn, Kaminski reported that he was feeling "okay," and was recovering from pneumonia. (LTD at 136.) Dr. Quinn noted that since Kaminski's last visit, she had increased his Zoloft dosage, and that Kaminski had requested early refills of Klonopin. (*Id.*) Dr. Quinn discussed with Kaminski that he could not take additional doses of Klonopin that were not prescribed, and at the next appointment, his dosage would likely be decreased. (LTD at 138.) She noted that Kaminski continued with the lifestyle renewal program and acupuncture treatments, and that it was recommended that he schedule an appointment with a health psychologist. (LTD at 136.) As for work, Kaminski was unsure about the future, and thought "it would be more helpful to have a job where he could move around more." (*Id.*)

Kaminski also provided Unum a January 18, 2017 treatment note from a visit with Dr. Engineer. (STD at 170.) At this visit, Kaminski's chief complaint was again chronic neck pain and nerve pain, with the pain location diffuse in the arms and legs, bilaterally. (*Id.*) He rated the pain severity as between 7 and 9 on a scale of 10, with the timing of pain "constant," and the pain trend "staying the same." (*Id.*) Dr. Engineer described his visit as follows:

> Peter is here for acupuncture visit today. Initial acupuncture visit was a little over a month ago, he states he had to cancel subsequent appointments because he was sick with pneumonia. He is feeling better now, off antibiotics, and has rescheduled the acupuncture visits. He states he does think he felt somewhat better, with decreased pain, for a few days after the initial acupuncture

16

> treatment.  He has not returned to the OT lifestyle renewal program nor
> scheduled appointment[s] with Dr. Greenberg in psychology.  He states he tried
> the Lyrica 25 mg. tid for 4–5 days but felt very tired and sleepy so he stopped
> it.  His psychiatrist also took him off Cymbalta and he is on Zoloft now.  He
> wonders about restarting baclofen.  He does take the medical marijuana, he
> states at bedtime, which he feels is somewhat helpful.

(*Id.*)

Kaminski next met with Dr. Engineer on January 25, 2017 for follow-up care and

acupuncture treatment.  (LTD at 143.)  Again, his chief complaint was chronic neck pain and

nerve pain, with the pain location noted as "Neck.  Diffuse pain bilateral arms and legs," the

pain severity ranging between 7 and 9 on a 10-point scale, and the timing of pain noted as

"constant."  (*Id*.)  Dr. Engineer observed, "Peter is here for acupuncture visit today.  He did

not notice any improvement in his pain after the treatment last week.  He states his muscles

feel very tight and it is hard to get up and start moving and difficult to exercise."  (*Id.*)  Dr.

Engineer noted that they discussed pool therapy, she recommended that Kaminski continue

with the occupational therapy lifestyle renewal program, and she made no changes in

Kaminski's medications.  (LTD at 145.)

On January 31, 2017, Kaminski met with psychologist Benjamin Greenberg, Ph.D.,

based on a referral from Dr. Engineer.  (LTD at 59.)  He noted that Kaminski had been

"experiencing chronic pain for the past 9 years, worsened over the past 3 years and again

approximately 8-9 months ago."  (*Id.*)  Dr. Greenberg summarized Kaminski's history as

follows:

> The patient explained that his presenting problems began in 2008 when he was
> diving off a boat in Lake Minnetonka and fractured his neck.  This resulted in
> him being paralyzed for approximately 3 months and intensive physical therapy
> afterwards.  The patient began working in 2010 at Land O'Lakes as a packaging

17

buyer.  He explained that his work was physically strenuous for him as [it] required him to sit for extended periods of time and worsened pain in his neck. The patient went on disability in 2015 because of the worsened pain, but was able to return to work.  However, in September 2016, he again went on disability because of the increased pain and has been off work since then.  Since that time, the patient has been questioning his ability to continue working in that position as of [sic] the aggravated pain that he has.  He explained that he tends to be fairly stoic with his chronic pain, but has concerns about his ability to function in the future.  The patient reported some feelings of guilt about considering no longer working at Land O'Lakes because they have treated him well and he receives good benefits from them.

(LTD at 60.)

Dr. Greenberg's progress note identified Kaminski's "pain location" as "mid-thigh down, shoulder, upper back, neck, upper arm."  (LTD at 61.)  He rated the pain severity as 6.5 on a scale of 10, with an average pain severity of 6 to 7 on a scale of 10.  (*Id*.)  He reported the "pain timing" as "constant with variations," and the "pain trend" as "worsening for past 3 years."  (*Id*.)  Pain-aggravating factors were noted to include "[s]itting or laying too long, moving too much, exposure to heat/cold on feet, poor sleep quality," and pain-alleviating factors included "[w]alking, swimming, stretching, heat, medical marijuana pills, distraction." (*Id*. at 62.)  Dr. Greenberg also noted that Kaminski had tried the following to manage his pain:

Acupuncture (relaxing but unsure if long-term benefit), medication (hit and miss for effectiveness – Baclofen seemed to work for 1  year before it no longer worked, has also tried Lyrica, gabapentin, Cymbalta, opioids, medical marijuana – if you get just the right amount it helps, but hard to find the right balance, etc.), PT – manual therapy (very effective for a few hours, but then sore 2 days later), massage ("took me out of commission for days"), spinal injection (several years ago, significantly worsened the pain), nerve stimulation, TENS.

(*Id*.)

18

Additionally, Dr. Greenberg noted Kaminski's exercise habits of "[w]alking (3 dogs), swim at least once per week, riding his bicycle (sensitive to the angle he sits)." (*Id.*)

Dr. Greenberg provided an "occupational history" as follows:

Short term disability since September, 2016. He has been working for Land-O-Lakes since 2010, with some breaks for disability secondary to chronic pain. He reported that he had a sit-stand desk at work, but would be in meetings for half of the day regularly and this would increase the pain. He was a packaging buyer there most recently, but has worked in 5-6 different areas. He expressed some interest in a career change because of how it would help him physically, but reported he has a hard time with this because of the good pay and benefits at Land-O-Lakes. He expressed working with the DNR or landscaping to help him move on a more frequent basis. However, he was uncertain how his physical limitations would affect him in the future. He hoped that if he improved physically, he would like to remain at Land-O-Lakes, but is uncertain if he can do this physically.

(LTD at 63.)

Kaminski next treated with Dr. Engineer on February 1, 2017 for a follow-up visit, with his chief complaint again noted as chronic neck pain and nerve pain. (LTD at 146.) Dr. Engineer observed that the previous week's acupuncture treatment did not appear to significantly reduce Kaminski's pain. (*Id.*) Further, she noted, "He continues to feel his muscles [] are very tight and it is hard to get up and start moving and difficult to exercise. He feels as though he has run many miles, when really has not been very active." (*Id.*) She also acknowledged that Kaminski would provide her with STD forms to update, and stated, "He remains unable to work." (*Id.*) Again, the record indicates the pain location as "Neck. Diffuse pain bilateral arms and legs." (*Id.*) Kaminski reported pain severity between 7 and 9 on a 10-point scale, with the timing of pain noted as "constant." (*Id.*) Dr. Engineer again assessed "Chronic neck pain. Status post cervical fusion. Cervical spinal cord injury, sequela.

Neuropathic pain." (LTD at 149.)  She observed that Kaminski would be starting pool therapy soon and "restarting OT lifestyle renewal program." (*Id.*)  She advised that he resume taking baclofen.  (LTD at 150.)

On February 2, 2017, Dr. Engineer provided Unum with additional information, stating that she continued to advise Kaminski to remain out of work beyond December 14, 2016.  (STD at 214.)  She based her decision on the following physical findings:  "He has severe neck, lower & upper extremity pain as well as significant fatigue, due to which he is not able to stand or sit for any significant length of time & unable to do even sedentary work." (*Id.*)  Dr. Engineer provided the following restrictions and limitations:  "Unable to sit or stand more than 30 minutes.  Not able to do lifting greater than 10 pounds more than occasionally." (*Id.*)  She stated that the current course of treatment included pool therapy, occupational therapy lifestyle renewal program, acupuncture, pain psychology, and pain medications. (STD at 215.)  Also, Dr. Engineer noted that she had seen Kaminski the previous day, and his next scheduled visit was for February 10, 2017.  (*Id.*)  As for the date on which she expected him to be able to return to work, Dr. Engineer stated, "Unknown.  Will need to be off work for at least 4 more months (through 6/1/17.)" (*Id.*)

On February 8, 2017, Kaminski met with occupational therapist Shepstone.  (LTD at 151.)  Shepstone noted that Kaminski had previously completed two occupational therapy sessions during his initial STD certification period, but his "attendance was limited by pain affecting ability to get out of his home and drive." (*Id.*)  As to Kaminski's subjective report, Shepstone noted the following:

[Patient] reports pain in legs has been really bad and sleep has been really bad.

20

I am not getting to sleep until 3 or 4 am because of pain and my whole system out of w[h]ack. Makes me feel like shit, nauseous, and more tired when I am already tired feels like I have gained about 20 pounds. [Patient] states that even just walking hurts and it sucks. I just lay down with my hot pack on my back and on my legs which gives some relief then I watch a movie to distract myself. So things have been pretty average. I am pretty sure my job is going to cut my job and downsize but I think they are taking this out on m[e] because of my disability[.] [T]hey cut 75 million dollars worth of jobs.

(*Id.*) Shepstone assessed that Kaminski showed "motivation and willingness to learn strategies of pain management with non-pharmacological methods." (LTD at 153.)

On February 9, 2017, Kaminski treated with physical therapist Brittany Wirth for an evaluation and aquatic therapy. (LTD at 155.) Wirth noted the following: "Patient is a 30 y/o male with a history of spinal cord injury with a cervical spinal fusion. He reports he has horrible nerve pain in his hands, arms, and legs that is constant." (*Id.*) Regarding the details of his pain, Wirth noted that Kaminski's pain intensity level was between 5 and 8 on a 10-point scale, located in his arms, hands, and legs. (*Id.*) Aggravating factors included "sit to stand, sitting, bending, driving, squatting, standing, stairs," while relieving factors were "heat, light walking." (*Id.*) Wirth noted, "Patient presents with neuropathic pain secondary to spinal cord injury." (LTD at 156.) She identified pain and muscle tightness/decreased flexibility as Kaminski's "significant impairments," and "difficulty sleeping, difficulty with household tasks, difficulty meeting work demands, difficulty with driving, difficulty with gait and difficulty with stairs" as his "functional limitations." (*Id.*)

On February 17, 2017, Kaminski met with Dr. Engineer for a follow-up visit and acupuncture treatment. (LTD at 158.) His chief complaint remained "chronic neck pain, nerve pain." (*Id.*) He reported that the acupuncture helped relax his body and calm some of

the nerve pain and tremors in his hands.  (*Id.*)  He stated that he was taking baclofen, which he felt offered some help with his sleep.  (*Id.*)  Additionally, Kaminski reported that he had joined a gym in order to use the treadmill and be more active.  (*Id.*)  He noted that a recent massage at the gym had caused his pain to flare up.  (*Id.*)  Dr. Engineer again noted that Kaminski's pain was in the neck and diffuse in the arms and legs, bilaterally.  (*Id.*)  Kaminski reported that his pain severity was a 5 on a 10-point scale, and was constant, with intermittent worsening.  (*Id.*)  Dr. Engineer again assessed chronic neck pain and neuropathic pain, (LTD at 161), provided acupuncture treatment, and recommended that Kaminski continue physical therapy, and treat with a pain psychologist.  (*Id.*)

On March 1, 2017, Kaminski met with Dr. Engineer for his next follow-up visit and acupuncture treatment.  (LTD at 163.)  Dr. Engineer noted that Kaminski felt that his leg pain seemed to be improving.  (*Id.*)  He planned to start pool therapy soon, but had been swimming independently and felt that swimming and acupuncture were helpful, and medications were somewhat helpful.  (*Id.*)  Again, Kaminski's pain location was found to be in the neck, along with diffuse pain in his arms and legs, bilaterally.  (*Id.*)  He rated his pain severity as 5 on a 10-point scale, with the pain frequency described as "constant with intermittent worsening." (*Id.*)  Again, Dr. Engineer assessed "Chronic neck pain.  Status post cervical fusion.  Cervical spinal cord injury, sequela.  Neuropathic pain."  (LTD at 164.)  Dr. Engineer provided acupuncture treatment, and recommended that Kaminski continue pool therapy, as well as the lifestyle renewal program, and treatment in pain psychology.  (*Id.*)

On March 29, 2017, Dr. Engineer corresponded with Unum, stating,

Peter A. Kaminski has a history of spinal cord injury with chronic neuropathic

22

> pain. He has extended periods of nerve pain in the neck, upper and lower extremities, which can be worsened with any significant sitting or standing at his desk. He also has significant insomnia and fatigue. These symptoms make it difficult for him to do his job at this time. He also has depression and anxiety which also impact his ability to do his job. He is currently undergoing therapies to help improve his symptoms.

(LTD at 45.)

On April 4, 2017, a Unum nurse, Carole Long, R.N., spoke with Dr. Engineer's office and reported the following: "Based on [employee] dealing with chronic nerve pain that limits his ability to be in one position for more than 10-15 min[utes], need for constant stretching, and fatigue from limited sleep due to pain, and given [employee] has [history of] traumatic spinal cord injury that required multi level fusion, [restrictions and limitations] related to concentration, standing/sitting are appropriate." (STD at 11, 563.) Nurse Long thus found Dr. Engineer's restrictions and limitations were medically supported through the end of the STD benefit period, April 22, 2017. (STD at 11.) In an April 5, 2017 letter, Unum informed Kaminski that his STD claim was approved through April 22, 2017. (STD at 571–72.)

### 3. LTD Benefits Claim and Review

Because Kaminski had reached the maximum 180 days of STD benefits, he applied for LTD benefits in April 2017. (LTD at 338.) Later that month, LOL eliminated his position and he was terminated. (Compl. ¶ 35.)

Unum assigned an LTD claims representative, Ashley Phillips, to Kaminski's LTD claim. (LTD at 36–42.) Phillips interviewed Kaminski by telephone on April 11, 2017. (LTD at 394.) Kaminski reported that the nerve pain from his diving accident "never went away," but got "worse and worse" with "prolonged sitting and standing." (LTD at 395.) He noted

23

that he had been working at LOL for seven years, during which time he had pain in his neck, arms, legs, and shoulders.  (*Id.*)  He stated that he was unable to sit or stand for more than 20 minutes at a time without getting a burning sensation, and even when sitting, he was "in constant pain and it's hard to focus," as the pain "engulf[ed] his body and mind."  (*Id.*)  Kaminski reported that some days, he was barely able to get out of bed, and he also experienced insomnia due to the pain.  (*Id.*)  He further noted that he wanted to work, and was doing everything possible to "get healthy."  (LTD at 396.)  He stated that he had "good days and horrible days," thought that things were "trending better," and he was trying to "get the right medications and exercise."  (*Id.*)   At the time of the interview, he stated that he felt like he was "in a fog" from a lack of sleep and pain.  (LTD at 397.)  Kaminski further reported that depending on how he felt and slept, on a typical day, he tried to use a treadmill and walk for 10-30 minutes, perform stretches, and take hot baths and/or use a large heating pad.  (*Id.*)  As to activities of daily living, he stated that he was able to drive, but because he found grocery shopping difficult, he had his groceries delivered, his mother helped him do laundry, and because he lacked the energy to care for his dog, his parents cared for it at their home.  (*Id.*)

Unum also assigned Plaintiff's claim to vocational and clinical reviewers.  (LTD at 413, 491–99.)   Kenneth Maxwell, a Vocational Rehabilitation Consultant, conducted a vocational review in May 2017.  (LTD at 498.)   Mr. Maxwell identified Kaminski's occupation in the national economy as "Buyer."  (LTD at 499.)  He concluded that the job was "sedentary," with the physical demands consisting of "[m]ostly sitting, may involve standing or walking for brief periods of time, lifting, carrying, pushing, pulling up to 10 [lbs.] occasionally.  The duties of this occupation would allow for changes in position for brief

periods of time throughout the day." (*Id.*)

Unum also requested medical records for Kaminski's care after the end of the LTD elimination period on April 22, 2017. (LTD at 454.) On May 16, 2017, Unum received an April 26, 2017 record documenting Kaminski's follow-up appointment with Dr. Engineer. (LTD at 484–85.) On that date, Kaminski reported chronic neck pain, bilateral arm and leg pain, and neuropathic pain. (LTD at 484.) Kaminski again noted that his job had been eliminated, he was switching to insurance through COBRA, and he had submitted an LTD benefits claim. (*Id.*) Dr. Engineer noted, "Overall his symptoms are the same and there has been no significant change since I last saw him." (*Id.*) Kaminski reported that he had been swimming every other day, which he found "very helpful," although he continued to have significant pain when not in the pool, along with ongoing fatigue and insomnia. (*Id.*) Kaminski also reported a pain severity level of 8 out of 10. (*Id.*) Dr. Engineer noted that his "pain trend" was "staying the same," with the frequency of pain described as "[c]onstant with intermittent worsening." (*Id.*) She noted pain-aggravating factors of sitting, standing, and lifting, and alleviating factors of swimming, medications, and acupuncture. (*Id.*) Dr. Engineer again diagnosed Kaminski with "[c]hronic neck pain. Status post cervical fusion. Cervical spinal cord injury, sequela. Neuropathic pain." (LTD at 485.) Kaminski's treatment plan included physical therapy and acupuncture. (*Id.*) Dr. Engineer also reviewed his medications and did not prescribe anything new. (LTD at 485–86.) She recommended that he continue swimming, and stated that he remained "unable to work at this time doing even sedentary work due to his chronic pain and fatigue." (LTD at 486.)

Unum's claims administrator, Ms. Phillips, informed Kaminski that she had received

the April 27, 2017 record, and Unum would require 30 days for review.  (LTD at 494–96.)
On May 22, 2017, Kaminski and his father phoned Ms. Phillips.  (LTD at 503–04.)
Concerned and frustrated, Kaminski's father asked why Unum required more time to evaluate
the LTD claim when his son's condition had not changed in the past year.  (*Id*.)  Ms. Phillips
acknowledged that the only new information was the April 27, 2017 medical record but that
a thorough review was needed, nonetheless, "based on the LTD policy provisions."  (LTD at
504.)

    In the treatment notes from Kaminski's May 24, 2017 follow-up visit with Dr.
Engineer, Dr. Engineer again observed that Kaminski's chief complaint was "[c]hronic neck
pain, bilateral arm and leg pain, neuropathic pain."  (LTD at 518.)  Kaminski reported that a
few weeks earlier, after helping his mother lift an object, he had an acute onset of low back
pain.  (*Id.*)  The pain was so severe that he was unable to stand upright, and he sought
emergency room care.  (*Id.*)  Kaminski was prescribed Norco and Valium for muscular strain.
(*Id.*)  At his visit with Dr. Engineer, Kaminski reported that his back pain was gradually
improving, although it remained significant.  (*Id.*)

    Dr. Engineer further reported the following about Kaminski's long-standing issues and
treatment plan:

> He has been participating in the OT lifestyle renewal program, and also doing
> physical therapy, both land and pool therapy, which he feels are helping with
> his low back pain.  He does continue to have chronic neuropathic pain related
> to his spinal cord injury.  He is frustrated as he states that his company is still
> reviewing his long-term disability and has not yet approved this.  He has
> ongoing fatigue and insomnia, diffuse pain in the arms and legs bilaterally.  He
> continues to work with psychology and psychiatry.  He continues on Lyrica 50
> mg 3 times a day, which he does feel is somewhat helpful.  He states he does
> not take the baclofen as he does not feel it is really helpful and states it causes

26

tremor in his arms.

(*Id.*)

As to Kaminski's "pain location," Dr. Engineer noted, "Low back centrally. Neck. Diffuse pain bilateral arms and legs, unchanged since recent onset of low back pain." (*Id.*) The severity of pain was rated at 7 to 9 on a 10-point scale, with the frequency described as "[c]onstant with intermittent worsening." (*Id.*) The "pain trend" was "[c]hronic neuropathic pain staying the same, low back pain gradually improving." (*Id.*) Dr. Engineer noted that pain-aggravating factors were sitting, standing, lifting, jarring, bending, twisting, and running, while pain-alleviating factors were swimming, medication, acupuncture, heat, icing, resting, and physical therapy. (LTD at 518–19.) She diagnosed acute low back pain and lumbar strain, in addition to her regular diagnosis of "Chronic neck pain. Status post cervical fusion. Cervical spinal cord injury, sequela. Neuropathic plan." (LTD at 520.)

As for treatment plans, Dr. Engineer recommended that Kaminski "[c]ontinue physical therapy and occupational therapy, both for his chronic neuropathic pain as well as for acute low back pain," and "[c]ontinue swimming/pool exercises." (*Id.*) In addition, Dr. Engineer referred Kaminski to a chronic pain clinic, "for his chronic neuropathic pain which remains significant and has been ongoing despite therapies." (*Id.*) She also noted that Kaminski had been on narcotic pain medications in the past, "but this caused cognitive and other issues, and he does not wish to resume taking narcotics. He may be a candidate for spinal cord stimulator or other interventions." (*Id.*)

With regard to Kaminski's ability to work, Dr. Engineer stated, "He remains unable to work at this time doing even sedentary work due to his chronic pain and fatigue. He requests

that I write another letter supporting his long-term disability claim, which I will do." (*Id.*)

That same day, May 24, 2017, Dr. Engineer wrote a letter to Unum regarding Kaminski's LTD claim. She stated:

> I am writing in support of Peter Kaminski's long term disability claim. Peter Kaminski has a history of spinal cord injury with chronic neuropathic pain since 2008. His nerve pain has been significantly worse for the past couple of years, particularly over the past year. He has chronic nerve pain in the neck, upper and lower extremities, which can be worsened with any significant sitting or standing. He also has significant insomnia and fatigue. Due to these symptoms, he is unable to do his regular job. In the past he had been taking narcotic pain medications which helped somewhat with his pain, but these medications caused cognitive and other side effects, and it is preferable that he does not continue to take these medications and he wishes to avoid them. He has been participating in physical therapy, both land and pool-based PT, as well as occupational therapy and has been taking medications as prescribed but is having ongoing symptoms which continue to be severe. I do not anticipate any significant improvement in his pain level and activity tolerance in the near future, and therefore do not think he will be able to return to work in the near future. He also has depression and anxiety which also impact his ability to do his job.

(LTD at 524.)

On May 24, 2017, April Vansandt, R.N., another Unum nurse, reviewed Plaintiff's medical records and vocational information at Unum's request. (LTD at 506–09.) Nurse Vansandt did not speak to Kaminski or examine him. Based on her paper review, she found that the medical information did not support a finding that Kaminski would be unable to perform his regular occupation. (LTD at 508.) She noted the following:

> The medical information in [the] file does not support [Plaintiff] from being precluded from performing full time activity including lifting up to 10#s, frequent sitting, with occasional stand/walk/fingering.

> There are inconsistencies within the records as to what the [employee] is reporting to providers and his level of activity. Dr. Engineer has been providing R&Ls [restrictions and limitations] since 9/2016. The restrictions noted of not

28

being able to sit or stand more than 30 minutes.  Following [employee's] October 25, 2016 [Date of Disability], doctors and therapies [*sic*] are noting that [employee] is traveling with his family to Europe and going to Michigan to their family cabin.  Additionally, in February 2017, [employee] reports considering working with "DNR" or landscaping to help him move more.  The restrictions continue to be inconsistent with [employee's] reported levels of activities of being out walking his dogs, traveling, swimming, and bicycling.

Exam findings and treatment plan have remained stable.  There are not any additional imaging records since 2015.  MRI unremarkable when compared to 2012 study.  No additional referrals for diagnostics or surgical evaluations have been made.  Based on his stable exams and diagnostics with no significant intervention [employee] would not be expected to be precluded from below demands.

With regards to [behavioral health], his psychologist has opined on [behavioral health] R&Ls and the [employee] does not feel that [behavioral health] is impairing.

(*Id.*)

Unum assigned its office staff physician, James Folkening, M.D., Internal Medicine, to review Kaminski's claim.  (LTD at 513.)  Dr. Folkening contacted Dr. Engineer by phone on May 25, 2017 to discuss Kaminski's case, and in particular, the restrictions and limitations that she had identified.  (LTD at 514–15.)  The background notes for the call state, in a section labeled "Claim Overview," that Kaminski suffered from "chronic neck pain and neuropathic pain, cervical spinal cord injury.  He had a diving accident in 200[8] and his nerve pain has progressively gotten worse since then."  (LTD at 513.)

During the call, Dr. Engineer indicated that she had seen Kaminski only days earlier, at which time he did not present with "immediate evidence of extreme pain."  (LTD at 514.) Dr. Engineer also confirmed that "there had been no new imaging studies or consultation with neurology or spine surgery." (*Id.*)

Dr. Folkening further summarized their conversation as follows:

> Dr. Engineer clarified that the majority of the claimant's pain involved the extremities instead of the neck.  This was thought to represent neuropathic pain related to the previous spinal cord injury and surgery.  Despite regular use of currently prescribed medication, the claimant describes extremity discomfort and heaviness that is exacerbated both by static positioning and by excessive activity.  I noted that the claimant is known to participate in a wide range of activities including walking his dog, bicycling, swimming, and driving.  I remarked that he had been able to take a trip to Europe with his family in late 2016.  When I said that this did not seem consistent with the claimant's inability to tolerate even sedentary activity, Dr. Engineer noted that the claimant forces himself to stay active, though is certainly not pain free with activity, and is often extremely fatigued afterwards.

(*Id.*)

Dr. Folkening also noted that "in Dr. Engineer's judgment, the claimant could not perform and sustain a 6–8 hour workday even in a sedentary setting allowing for periodic position changes.  Dr. Engineer said she referred the claimant to a new pain clinic at the most recent visit of two days ago and was hoping that additional measures could be taken to make the claimant more comfortable."  (*Id.*)

Following the call, Dr. Folkening concluded, "Dr. Engineer does not offer a credible rationale for continuing to restrict or limit the claimant from performance of full-time sedentary activity as described."  (LTD at 515.)

Like Nurse Vansandt, Dr. Folkening did not speak to Kaminski or examine him.  Using the description provided by Unum's vocational reviewer of the physical demands of the position of "Buyer," (LTD at 499), Dr. Folkening reviewed Kaminski's medical records in order to address the following question:  "Does the medical information in the file support [employee] would not be able to perform full time activity including mostly sitting, may involve standing or walking for brief periods of time, lifting, carrying, pushing, pulling up to

30

10 lbs occasionally?" (LTD at 526.) He concluded that Dr. Engineer's restrictions and limitations were "not supported" throughout and beyond the interval from October 25, 2016 to April 22, 2017. (*Id.*)

Discussing Plaintiff's October 4, 2016 occupational therapy visit, Dr. Folkening stated, "The claimant reported decreased function with daily activities. However, with regard to exercise routine, the claimant reported mowing the lawn, walking with his dogs for 5-7 miles, and swimming almost daily. He said he did not run because of the jarring intensifying his neck pain." (LTD at 528.) He further noted Kaminski's July 2015 MRI, and that "[n]o provider has suggested additional imaging or other diagnostic studies to further investigate the claimant's reported moderate to severe discomfort and related functional limitation." (*Id.*) Finally, Dr. Folkening concluded:

> In summary, there is not verification in available records of a substantive change in the claimant's clinical condition approaching or at the [date of disability] that would have rendered him no longer able to sustain full-time occupational activity as described in the referral question. . . . Despite the claimant's complaints of unremitting pain and dysfunction, there is ample documentation in file records of a broad range of physical activities the claimant has demonstrated the ability to perform. This is not consistent with an individual of only sub-sedentary capacity. . . . Dr. Engineer alluded to the role of behavioral health issues (depression and anxiety) in contributing to the claimant's impairment. This assessment is not in agreement with either the claimant or his [behavioral health] provider of record.

(LTD at 528–29.)

In light of the disagreement between Kaminski's longtime attending physician and Unum's office staff physician, Unum referred Kaminski's claim to its designated medical officer, Alan Neuren, M.D., Neurology and Psychiatry. (LTD at 532, 538.)

Like Dr. Folkening, Dr. Neuren conducted a paper review of Kaminski's claim. He

31

never examined Kaminski nor did he speak with him. In his May 30, 2017 review, Dr. Neuren

agreed with Dr. Folkening's opinion, stating:

> In my opinion, Dr. Engineer's opinion is not supported due to issues noted
> below. Insured is claiming to be impaired due to neck pain. History is
> significant for a remote cervical fracture from a diving accident in 2009.[7]
> Insured required surgery. Most recent MRI in 2015 showed an area of
> myelomalacia at C4-5 along with surgical changes. Exam findings consist of
> reported tenderness of the posterior spine and trapezius muscles and some
> reduction of cervical motion. He has been noted not to be in distress and to
> appear comfortable. Dr. Engineer has opined [about] the insured's pain.
>
> In spite of pain complaints, records indicate insured has been able to engage in
> walking his dog 5-7 miles a day, swimming every other day, cycling, and doing
> yard work. He was also able to travel to Europe.
>
> There is no documentation that any further studies were done to assess if there
> was a physical basis to the worsening pain complaints. As noted, last MRI was
> in 2015. Information provided reveals limited exam findings that would not
> preclude sedentary work, allowing for periodic changes in position for comfort.
> Claimant's reported activity, including the ability to travel overseas, walk
> several miles a day, swimming, etc. are inconsistent with an inability to
> function in a sedentary capacity.

(LTD at 532.)

On May 31, 2017, Unum informed Kaminski that it had denied his LTD benefits

claim. (LTD at 542.) Unum's decision letter, written by a person named Christine M.

Howard on behalf of Unum claims representative Ms. Phillips, observed that Kaminski's

claim was based on his "worsening chronic neck pain, neuropathic pain and cervical spinal

cord injury after a diving accident." (*Id*.) Unum stated that it had reviewed Kaminski's

medical and physical therapy records, noting Dr. Engineer's restrictions and limitations that

---

[7]      Both Dr. Folkening and Dr. Neuren incorrectly referred to the date of the diving
accident, stating that it occurred in 2009, when it had occurred in 2008. (LTD at 526, 532.)

Kaminski was "not able to sit or stand for any significant length of time due to severe chronic pain in his neck, bilateral arms and legs and is therefore unable to do even sedentary work at this time." (*Id.*)

Unum described the physical demands of Kaminski's job, as determined by Unum's vocational reviewer, as follows: "mostly sitting, may involve standing or walking for brief periods of time, lifting, carrying, pushing, and pulling up to 10 pounds occasionally. The duties of the occupation would allow for changes in position for brief periods of time throughout the day." (*Id.*)

Unum provided the "Information That Supports Our Decision" on a single page of the five-page letter, stating that "a medical resource" had reviewed Kaminski's records and found that the medical information did not support "the inability to perform lifting up to 10 lbs., frequent sitting, and occasional stand/walk/fingering." (*Id.*) In addition, Unum noted that "[a] physician, Board Certified in Internal Medicine, contacted Dr. Engineer to clarify [Kaminski's] restrictions," however, "Dr. Engineer did not change her opinion regarding the restrictions provided." (*Id.*) Unum then stated:

> Therefore, two physicians, one Board Certified in Internal Medicine and the second Board Certified in Neurology/Psychiatry reviewed your entire claim file.

> Exam note reported tenderness of the posterior spine and trapezius muscles and some reduction of cervical motion. Records note you were not in distress and you appeared comfortable. Information documents you have been able to walk your dog 5-7 miles a day, swim every other day, cycle, and do yard work. You were also able to travel to Europe.

> The information does not support the inability to perform lifting up to 10 lbs., frequent sitting, and occasional stand/walk/fingering. The supported restrictions do not exceed the physical requirements of your regular occupation.

Based on our review, the information in your claim file indicates you are able to perform the duties of your own occupation and your claim has been closed with no benefits payable.

(*Id.*)

On May 31, 2017, Unum likewise informed Kaminski that it had denied his LWOP benefits. (LWOP at 154–58.) The only medical records in Unum's LWOP file are Dr. Engineer's office notes for April 26, 2017 and May 24, 2017, and her letter of May 24, 2017. (LWOP at 137–39, 145–57, 151.) Unum's LWOP claims administrator found that because Unum's LTD department had concluded that Kaminski could perform a sedentary job, it was "reasonable for LWOP to close for not [totally disabled] own occ[upation]." (LWOP at 11.) In all other material respects, the LWOP denial letter was identical to the LTD denial letter. (*Compare* LTD at 542–46 *with* LWOP at 154–58.)

### 4. Administrative Appeal

In July 2017, Kaminski obtained legal counsel, Diana Young Morrissey, to appeal Unum's denial of benefits. (LTD at 559.) On December 29, 2017, Ms. Morrissey submitted the appeal, which included more detailed records from Kaminski's 2015 treatment for chronic pain at Craig Hospital, a critique of Unum's decision making, and records from a Physical Abilities Test ("PAT") conducted by physical therapist John Hovde. (LTD at 588–648.)

The PAT, conducted on December 11, 2017, measured Kaminski's physical ability to perform work. Hovde found that Kaminski presented with widespread sensory impairment, impaired balance and coordination, and upper extremity and lower extremity clonus.[8] (LTD

---

[8]     Plaintiff notes that "[c]lonus is a type of neurological condition that creates involuntary muscle contractions. This results in uncontrollable, rhythmic, shaking

at 651.)   Hovde did not test Kaminski's endurance for sedentary work due to the time constraints of a two-hour testing session, but stated, "It seems that his employability related to office work is largely affected by intractable pain."  (LTD at 655.)  On dexterity tests, Hovde found that Kaminski "performed poorly . . . due to upper extremity shakiness and deliberate hand movement."  (LTD at 652.)  Kaminski's walking speed was assessed as "well below average" speed and distance.  (LTD at 653.)  On a typing test, Kaminski was able to type 25 words per minute over a period of four minutes.  (LTD at 654.)  Hovde commented on Kaminski's use of his hands for repetitive action as "[s]low, inefficient, self-paced finger and hand use."  (LTD at 657.)  The "Most Important Observations" from the PAT were "The client has impaired dexterity and clonus in his wrists and forearms that impairs finger/hand dexterity.  He has mild impairment of balance.  He has loss of strength which limits lifting to 25 lbs."  (LTD at 655.)

In Attorney Morrissey's appeal letter to Unum, she argued that Unum had failed to adequately consider Kaminski's claim.  (LTD at 640.)  She asserted that the basis for Unum's denial of benefits "conflate[d] notes and findings randomly plucked from Mr. Kaminski's 2016 medical records," and lacked any identifying information regarding the dates of medical encounters and the names of providers.  (*Id.*)  Given the lack of identifying information, she found it unclear whether the excerpts were "hand-picked by Unum's physicians," or "by Ms. Howard when drafting the denial letter." (*Id.*)  Ms. Morrissey asserted that Unum had failed to properly consider significant issues, including the following:  (1) Kaminski attends medical

---

movements."  (Pl.'s Mem. at 28 n.140) (citing https://www.healthline.com/health/clonus, accessed Aug. 10, 2020).

appointments on "good days," when he has the energy and ability to do so, therefore, it is not inconsistent with a finding of disability that he did not exhibit distress or extreme pain at a given appointment; (2) Kaminski's pain worsened when he discontinued the use of narcotic pain medications, now considered addictive and dangerous; (3) sleep deprivation and chronic pain forced Kaminski to withdraw from his job; (4) Unum failed to address the inconsistencies between the findings of Dr. Engineer, his primary physician, and the interview notes of a physical therapist, which appeared to include a transcription error; and (5) the medical records and PAT report documented Kaminski's inability to perform the main duties of his job. (*Id.* at 641–44.)

On appeal, Unum provided Kaminski's records to its reviewing physician Dr. Linda Cowell, a specialist in neurology and psychiatry. (LTD at 709–13.) Dr. Cowell acknowledged that Kaminski's chronic pain related to the spinal cord injury required "ongoing regular management as well as work modification that would allow for a change of position," but she found that he could be accommodated in a sedentary job. (LTD at 711.) She disagreed that Kaminski's chronic pain had progressed to the point that he was unable to perform full-time sedentary physical activities, stating, "The insured's medical records indicate the insured no longer requires narcotic analgesic treatment, has responded to suggestions made by OT and has had limited pharmacological trials at low dosages for his chronic pain syndrome." (*Id.*) While Dr. Cowell acknowledged that Kaminski was under Dr. Engineer's care for pain management, she found the records were inconsistent with an intractable pain syndrome based on the following: (1) Dr. Engineer's records and pharmacy records were, in her view, inconsistent and did not confirm medication trials were completed;

(2) occupational therapy sessions were infrequent; and (3) "observations noted during the insured's office visits d[id] not document significant pain behavior." (*Id.* at 712.)

Discussing Kaminski's treatment for anxiety and depression associated with insomnia, Dr. Cowell noted discrepancies regarding Kaminski's dosage for Klonopin, and also stated, "the insured has indicated the ongoing use of medical marijuana for treatment of insomnia and had a DWI 11/18/15." (*Id.*) She found that Kaminsky's behavioral health issues did not preclude sedentary work, nor was there any indication in the medical records that he had received any restrictions and limitations for behavioral health issues. (*Id.*) Still addressing behavioral health, Dr. Cowell stated, "The medical information in the file is consistent with ongoing behavioral health symptoms that are not of the severity that the insured would be unable to perform full time sedentary duties. This is consistent with the insured's ongoing reported activities that include travel as well as his stated plans to consider other vocational opportunities in the future." (*Id.*)

In connection with Kaminski's appeal, Unum sought clarification from Dr. Cowell regarding the frequency and duration of Kaminski's need to change position from a sedentary position to manage the pain.[9] (LTD at 716.) In a February 2018 addendum to Kaminski's LTD claim file, Dr. Cowell stated that "the information in the file is consistent with an individual who would be expected to be able to perform full time sedentary activities however

---

[9] Unum's request for clarification to Dr. Cowell stated, "In your written review completed 1/31/18, you note 'work modification that would allow for a change of position as needed from sitting, standing or walking however would be expected to be able to be accommodated in a sedentary occupational duty.' Please describe the frequency of 'as needed' to ensure we have a full understanding of what the accommodation is." (LTD at 716.)

would require a change of position if seated on an hourly basis for a period of 5 minutes.  If the insured's work environment allowed for his duties to be performed in either a standing or sitting position that allowed for the insured to vary his position throughout the day, no break would be needed."  (LTD at 716–17.)

Unum also sought clarification from its vocational rehabilitation consultant Shannon O'Kelley about the keyboarding demands of the occupation of "Buyer."  (LTD at 718.) O'Kelley stated that  Kaminski's regular occupation required frequent keyboard use (up to 2/3 of the work day), but did not require a level of precision or rate of speed "as would be expected of typists, data entry clerks, and similar."  (LTD at 719.)

Unum then asked Dr. Cowell whether the medical records supported a finding that Kaminski could perform the keyboarding work identified by O'Kelley.  (*Id*.)  Dr. Cowell opined that Kaminski would be able to perform frequent keyboarding (up to 2/3 of the work day).  (LTD at 719–20.)  She based her opinion on the following:

> The insured was observed to have performed a series of dexterity tasks with shaky and deliberate movement however despite this observation was considered to be able to perform repetitive simple grasping, firm grasping, pinching, and fine manipulation.  The insured demonstrated the ability to perform a keyboard activity for 10 minutes at a rate of 25 words per minute. The insured was able to demonstrate keying with all digits.  The PT observations confirm that[,] although the insured's use of the upper extremities has been described as slow and effortful.  While the insured has signs and symptoms of ongoing myelopathy he has also demonstrated some retained residual function that would be expected to allow the insured to be able to perform the following duties on a frequent basis:  keyboarding, simple grasp, firm grasp, pinching, or manipulation.

(*Id*.)

In a February 9, 2018 letter from Lead Appeals Specialist Celeste P. Godbout, Unum

notified Kaminski that it affirmed the denial of his LTD and LWOP claims.  (LTD at 727–

36.)   Unum explained its review process, which included defining Kaminski's regular

occupation as a "Buyer."  (LTD at 728.)  As performed in the national economy, Unum found

that the job of "Buyer" included a combination of the following material and substantial

duties:

> • Receives and reviews requisitions requesting goods or services.
> • Communicates with vendors to obtain product or service information, such as price, availability, and delivery schedule.
> • Selects products for purchase by testing, observing, or examining items.
> • Expedites orders and requests as needed.
> • Responsibilities are those of a professional level and excluded are paraprofessional buyers.
> • Estimates values according to knowledge of market price.
> • Determines method of procurement, such as direct purchase or bid.
> • Prepares purchase orders or bid requests.
> • Reviews bid proposals and negotiates contracts within budgetary limitations and scope of authority.
> • Maintains procurement records, such as items or services purchased, costs, delivery, product quality or performance, and inventories.
> • Discusses defective or unacceptable goods or services with inspection or quality control personnel, users, vendors, and others to determine source of trouble and take corrective action.
> • Keeps abreast of market trends, changes in business practices in the assigned markets, new or altered types of materials entering the market, etc.
> • May work with manufacturers or persuade potential vendors to undertake the manufacturing of custom-designed items according to user's specific needs and specifications.
> • May approve invoices for payment.
> • May expedite delivery of goods to users.

(*Id*.)  Unum's definition of the physical demands for the job of "Buyer" remained the same.[10]

---

[10]      Again, Unum defined the physical demands for a "Buyer" as "Sedentary work: Mostly sitting, may involve standing or walking for brief periods of time, lifting, carrying, pushing, pulling up to 10 pounds occasionally.  The duties of this occupation would allow for changes in position for brief periods of time throughout the day."  (LTD at 728.)

(*Id.*)

Among the reasons for denying Kaminski's appeal, Unum referred to the "static" nature of his condition since his original injury, and his "stable level of neurological function and a work history of having been able to perform full time duties over a long period of time." (LTD at 730.)  In addition, Unum stated that the results of the PAT evaluation demonstrated that Kaminski could perform the duties of his job, including frequent keyboarding for as much as 2/3 of the work day.  (*Id.*)

While Unum acknowledged that Kaminski was under Dr. Engineer's longtime care for pain management, it again stated that "the records are not consistent with an intractable pain syndrome," citing "inconsistencies" between medical and pharmacy records that did not confirm that medication trials were completed, infrequent occupational therapy sessions, although they were described as helpful, and "observations noted during the office visits [did] not document significant pain behavior."  (*Id.*)

Unum also acknowledged that Plaintiff's condition had not changed during his STD leave from October 2016 through April 2017, and up to the date of the appeal decision, stating:

> There is no new neurological condition or progression of any previous condition that suggests there was change in functional abilities during October 24, 2016 through the elimination period of April 22, 2017 and ongoing that would limit or restrict [Kaminski] from performing full time sedentary duties. Mr. Kaminski's physical abilities have rem[a]ined stable.  His chronic pain below the C5 level is chronic, requires ongoing monitoring, and pharmacological support, however, would not limit him from performing his regular occupation.

(LTD at 731.)

### 5.   This Lawsuit

Following the denial of Kaminski's appeal, on July 29, 2019, he commenced this ERISA civil enforcement action to recover benefits under the terms of the applicable Unum policies.  In particular, he seeks the following relief:  (1) payment of all past due LTD benefits plus interest through the date of judgment; (2) reinstatement into the LTD policy and commencement of payment of monthly LTD benefits going forward from the date of judgment according to the terms of the policy; (3) reinstatement into coverage under the life insurance policy with the full LWOP benefit from the date of entitlement to the present and continuing during Plaintiff's disability according to the terms of the policy; and (4) reimbursement of the costs and expenses of this litigation pursuant to 29 U.S.C. § 1132(g). (Compl. ⁋ 52.)

### 6.   Parties' Positions on Cross Motions for Summary Judgment

The parties filed cross motions for summary judgment.  Kaminski argues that he is entitled to summary judgment, including an order that awards him all past due LTD benefits, LWOP benefits, and reimbursement for attorneys' fees and costs.  (Pl.'s Mem. at 57; Compl. ⁋ 52.)   He contends that the Court should apply a de novo standard of review to Unum's decision to deny LTD benefits, and sliding-scale reduced deference under an abuse of discretion review to Unum's decision on the LWOP claim.  (Pl.'s Mem. at 33–44; Pl.'s Reply [Doc. No. 32] at 1–2.)  Even under an abuse of discretion standard of review, Plaintiff argues that Unum's decision to deny his benefit claims cannot be sustained, as it was unreasonable.  (Pl.'s Mem. at 45–56.)

Unum, on the other hand, argues that the Court should uphold its decision to

discontinue Plaintiff's disability benefits.  (Def.'s Mem. Supp. Summ. J. ("Def.'s Mem.")
[Doc. No. 19] at 1.)  It contends that its decision is subject to an abuse of discretion standard
of review, (*id.* at 18–21), and that it did not abuse its discretion in denying benefits.  (*Id.* at
21–22.)  Rather, Unum asserts that its decision was reasonable, because it reasonably
determined the physical requirements of Kaminski's occupation, (*id.* at 22–24), and found
that the evidence failed to support ongoing restrictions and limitations.  (*Id.* at 24–29.)
Unum further contends that regardless of the standard of review the Court applies, it is
entitled to summary judgment.  (*Id.* at 29.)  Relatedly, Unum argues that Kaminski is not
entitled to LWOP benefits.  (*Id.* at 29–30.)  However, if the Court declines to uphold
Unum's benefits decisions, Unum claims that any benefits awarded must be limited to the
24-month "regular occupation" period, and be subject to a reduction based on estimated
Social Security Disability Insurance ("SSDI") benefits potentially available to Kaminski.
(*Id.* at 30–33.)

## II.   DISCUSSION

### A.  Summary Judgment

#### 1.  Summary Judgment Standard of Review

A court may grant a party summary judgment if there are no disputed issues of material
fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A
party opposing summary judgment "'must set forth specific facts showing that there is a
genuine issue for trial,' and 'must present affirmative evidence in order to defeat a properly
supported motion for summary judgment.'"  *Ingrassia v. Schafer*, 825 F.3d 891, 896 (8th Cir.
2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986)).  A fact dispute

is "material" only if its resolution would affect the outcome of the suit, and "genuine" only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  In considering a summary judgment motion, the Court must "view[ ] the evidence in the light most favorable to the nonmoving party," *Grinnell Mut. Reinsurance Co. v. Schwieger*, 685 F.3d 697 (8th Cir. 2012), and must not "weigh the evidence and determine the truth of the matter itself." *Nunn v. Noodles & Co.*, 674 F.3d 910, 914 (8th Cir. 2012).

### 2.  Standard of Review Applicable to Plan Administrator's Denial of LTD Benefits

There is no dispute that ERISA, 29 U.S.C. §§ 1001, et seq., applies to the insurance policies in question.  Under ERISA, employee benefit plans must "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C.A. § 1133(2).  After such a review, "a participant or beneficiary" may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

### a.  Minn. Stat. § 60A.42 (2015):  the Minnesota Legislature's Prohibition on Discretionary Review of an Administrator's Denial of Benefits Under an ERISA Plan

Because ERISA does not provide the standard of review by which courts are to analyze challenges to benefit determinations, the Supreme Court set forth the standard in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  There, the Supreme Court held that

"the *wholesale* importation of the arbitrary and capricious standard into ERISA is unwarranted," and an administrator's denial of benefits under an ERISA plan is to be "reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 109, 115 (emphasis in original).  When a policy expressly gives the plan administrator discretionary authority to determine eligibility for benefits, an abuse of discretion standard generally applies. *Id.*; *DaPron v. Spire Mo., Inc.*, 963 F.3d 836, 838 (8th Cir. 2020).  However, the plan administrator bears the burden of overcoming the presumption that de novo review applies by showing that the policy contains "explicit discretion-granting language."  *See Walke v. Grp. Long Term Disability Ins.*, 256 F.3d 835, 839 (8th Cir. 2001) (quoting *Bounds v. Bell Atl. Enter. F.L.T.D. Plan*, 32 F.3d 337, 339 (8th Cir. 1994) (noting that because the insurer submitted no evidence demonstrating discretionary intent, de novo review applied)).

Legal commentators have observed that following the *Firestone* decision, "'plan administrators, including insurers that underwrite health, life and disability insurance plans subject to ERISA, have been able to insulate their decisions from exacting judicial scrutiny by including 'discretionary clauses' in their plans.'"  *Davis v. Unum Life Ins. Co. of Am.*, 4:14-CV-00640-KGB, 2016 WL 1118258, at *3 (E.D. Ark. Mar. 22, 2016) (quoting Jo-el Meyer & Mark DeBofsky, *Discretionary Clauses in ERISA Health and Disability Plans— Are They Still Viable?*, Bloomberg BNA (2015), http://www.debofsky.com/What-s-New/Discretionary-Clauses-in-ERISA-Health-and-DisabilityPlans-Are-They-Still-Viable.pdf.).  In reaction to insurers' use of discretionary clauses, in 2002, the National

Association of Insurance Commissioners ("NAIC") promulgated the "Prohibition on the Use of Discretionary Clauses Model Act," and urged state legislatures to enact legislation prohibiting such clauses in health and disability policies. *Id.* (citing Joshua Foster, *ERISA, Trust Law, and the Appropriate Standard of Review: A De Novo Review of Why the Elimination of Discretionary Clauses Would Be an Abuse of Discretion*, 82 St. John's L. Rev. 735, 745 (2008)).

In 2015, the Minnesota Legislature enacted such legislation—Minn. Stat. § 60A.42—which prohibits insurers from granting themselves discretionary authority to interpret their policies and to reserve for themselves a more favorable standard of review.[11]   The statute provides:

> No policy, contract, certificate, or agreement offered or issued in this state providing for disability income protection coverage may contain a provision purporting to reserve discretion to the insurer to interpret the terms of the contract or provide a standard of review that is inconsistent with the laws of this state, or less favorable to the enrollee when a claim is denied than a preponderance of the evidence standard.

Minn. Stat. § 60A.42.[12]   The statute became effective on January 1, 2016, "and applies to policies issued or renewed on or after that date."  2015 Minn. Sess. Law Serv. Ch. 59 (S.F. 997).

---

[11]     Twenty-four other states have enacted similar legislation.  (Pl.'s Mem. at 36–37 n.179) (listing state statutes).

[12]     At a Minnesota House Conference Committee meeting on the bill, one of its sponsors, Representative Joseph Atkins, referred to disability policies with discretionary clauses as "relics from the olden days" that allow courts to review only for an abuse of discretion, and noted that the bill was modeled on the NAIC's language in its model act.  Minnesota Legislature, media file, https://www.lrl.mn.gov/media/file?mtgid=1008995, at 26:28–29:00 (House Conf. Cmte. on S.F. 997, May 15, 2015).

### b.    The Policy and Amendment No. 3

The Policy here contains a discretion-granting clause, stating, "when making a benefit determination under the policy, Unum has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy." (LTD at 352.)  The Policy also provides that it is "governed by the laws of the governing jurisdiction and to the extent applicable by [ERISA] and any amendments." (*Id*.)  Unum does not dispute that Minnesota law applies to the Policy.  (*See* Def.'s Mem. at 18–21) (discussing Minnesota statutes and case law with respect to the Policy).

As noted, the Policy's "effective date" is January 1, 2013, with an annual anniversary date of January 1.  (LTD at 342.)  However, "Amendment No. 3" to the Policy states, "[t]he entire policy is replaced by the policy attached to this amendment." (LTD at 341.)  The amendment, which contains an effective date of May 1, 2016, does not identify any specific changes that it effected.  (*See id.*)  Unum does not in fact contend that any discrete changes were made to the Policy.  Nor do the parties appear to dispute that the Policy attached to Amendment No. 3 is the version of the plan applicable to Kaminski's LTD claim.  The initial question before the Court then is whether the amendment's May 1, 2016 effective date subjects the Policy to Minn. Stat. § 60A.42, and voids the discretionary clause, or whether the Policy's original effective date of January 1, 2013 applies, removing the Policy from the scope of Minn. Stat. § 60A.42, and thus requiring discretionary review.

Kaminski argues that the Policy was effectively "renewed after January 1, 2016," as it was not amended but rather replaced in its entirety, and is therefore subject to Minn. Stat. § 60A.42.  (Pl.'s Mem. at 39–42.)  He notes that in *Rustad-Link v. Providence Health & Servs.*,

46

306 F. Supp. 3d 1224, 1236 (D. Mt. 2018), and *Jacob v. Unum Life Ins. Co. of Am.*, No. 16-17666, 2017 WL 4764357, at * 3–5 (E.D. La. Oct. 20, 2017), each court considered similar Unum policies with "amendments" that did not make any change to the policies but rather replaced the entire policies, and found that discretionary clauses within those policies were voided by state bans on insurers' discretionary authority.   Kaminski also cites *Price v. Tyson Long-Term Disability Plan*, No. 5:16-CV-05-75, 2017 WL 3567531, at *3–6 & n.6 (W.D. Ark. Aug. 17, 2017), another case involving a disability policy issued by Unum.  Although the court found for Unum on different facts, it observed that the policy amendment would have been subject to a discretionary ban if it had been issued after the statute's effective date. *Id.*

Again, Minn. Stat. § 60A.42 applies to "policies issued or renewed" after January 1, 2016, and Unum argues that "the term 'issued' is commonly understood to refer to new policies."  (Def.'s Mem. at 18) (citing *Sutherland v. Allstate Ins. Co.*, 464 N.W.2d 150, 153 (Minn. Ct. App. 1990)).   In support, Unum points to other insurance-related statutes in Minnesota that are effective if "issued, renewed, or amended" after a certain date, arguing that this suggests "renewal" and "amendment" are distinct terms in the insurance context.  (*Id.* at 19) (citing Minn. Stat. § 62A.21, subd. 3 ("Subdivision 1 applies to every policy of accident and health insurance which is delivered, issued for delivery, renewed or amended on or after July 19, 1977); Minn. Stat. § 62C.142 ("Subdivision 1 applies to every subscriber contract which is delivered, issued for delivery, renewed or amended on or after July 19, 1977.").  Therefore, Unum argues, the Minnesota Legislature could have made Minn. Stat. § 60A.42 applicable to polices "issued or renewed *or amended*" after January 1, 2016, if it had intended

47

to do so.  (*Id.*) (emphasis added).  Also, Unum relies on *Barrett v. Life Ins. Co. of N. Am.*, No. 11 C 6000, 2012 WL 3544839, at \*2 (N.D. Ill. Aug. 16, 2012), in which the court considered an Illinois statute similar to Minn. Stat. § 60A.42, applicable to plans renewed after July 1, 2005, and found that an amendment to the policy occurring after the statute's effective date did not subject the policy to the statute and a less deferential standard of review.

### c.      Analysis

The parties' cross motions appear to present an issue of first impression in Minnesota. However, because insurance policies are contracts, the Court is guided by longstanding principles of contract law. *Midwest Family Mut. Ins. Co. v. Wolters*, 831 N.W.2d 628, 636 (Minn. 2013).   "Our objective when interpreting insurance contracts is to 'ascertain and give effect to the intention of the parties as reflected in the terms of the insuring contract.'" *Eng'g & Constr. Innovations, Inc. v. L.H. Bolduc Co., Inc.*, 825 N.W.2d 695, 704 (Minn. 2013) (quoting *Jenoff, Inc. v. N.H. Ins. Co.*, 558 N.W.2d 260, 262 (Minn. 1997)).  All parts of a plan document must be interpreted to give meaning to all of the terms, in the manner in which a reasonable person would interpret them.  *Harris v. The Epoch Group, L.C.*, 357 F.3d 822, 825 (8th Cir. 2004);  *Jalowiec v. Aetna Life Ins. Co.*, 155 F. Supp. 3d 915, 919 (D. Minn. 2015) (noting that "courts must look at the ERISA plan as a whole.").

Turning now to the Policy, Unum's language in Amendment No. 3 is of particular significance.  It states, "This amendment forms a part of Group Policy No. 99345 002 issued to the Policyholder:  Land O'Lakes, Inc. . . . .  The *entire policy is replaced* by the policy attached to this amendment."  (LTD at 341) (emphasis added).  As noted, the effective date of Amendment No. 3 was May 1, 2016.  (*Id.*)  Unum argues that to "amend" a policy is not

48

the same as to "issue" or "renew" a policy, and only policies issued or renewed after January 1, 2016 fall under Minn. Stat. § 60A.42's prohibition. (Def.'s Mem. at 18–19.)  But Unum's Amendment No. 3 did not in fact "amend" or change any discrete portion of the Policy.  In plain language that Unum drafted, Amendment No. 3 "*replaced*" "*the entire policy*." (LTD at 341) (emphasis added).  As Plaintiff notes, Unum routinely uses the "amend and replace" language in its policies to avoid de novo review.  *See, e.g.*, *Koyuncu v. First Unum Life Ins. Co.*, No. 1:16-CV-04380-ELR, 2018 WL 9415108, at *1 (N.D. Ga. Sept. 28, 2018); *Rustad-Link*, 306 F. Supp. 3d at 1236; *Jacob*, 2017 WL 4764357, at *1; *Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 926 (9th Cir. 2012); *Dosky v. UNUM Life Ins. Co. of Am.*, No. 1:03CV2500, 2006 WL 435938, at *3 (N.D. Ohio Feb. 17, 2006); *Moon v. White*, 909 F. Supp. 1047, 1051 (E.D. Tenn. 1993).

In several cases—all decided against Unum—courts have found that where "amended" policies fall within the effective date of statutes prohibiting insurers' discretionary authority, the policies are subject to the default de novo standard of review.  In *Rustad-Link*, 306 F. Supp. 3d at 1235–36, for example, the court found that application of de novo review was appropriate for several reasons, including the fact that the plan at issue renewed every year on January 1, and was "prefaced with an Amendment stating that '[t]he entire policy is replaced by the policy attached to this amendment,'" with an effective date after the enactment of Washington's prohibition against the use of discretionary clauses in disability insurance policies.  While the primary basis for the court's ruling was that Washington's statute applied "where it was in effect at the time a claim arose," *id.* at 1234, again, the court found it noteworthy that the "amendment" in fact replaced the entire policy after the effective date of

49

the statute, just as Amendment No. 3 does here.

In *Jacob*, Unum again made the argument that the disability benefits policy in question was in continuous effect since its inception, and was therefore not subject to two Texas statutes that banned the issuance of new policies containing a discretionary clause. 2017 WL 4764357, at *3. One of the two statutes applied on the effective date of any "change, modification, or amendment" of the policy occurring on or after June 1, 2011. *Id*. The other statute applied to policies "delivered, issued for delivery, or renewed" before January 1, 2012. *Id.* at *5. As in Amendment No. 3 here, the policy in *Jacob* contained an "amendment" that did not in fact amend or change the policy but rather provided that, "[t]he entire policy is replaced by the policy attached to this amendment." *Id.* at *1. The court noted that if the amendment constituted a new policy, the statutory requirement that the policy be issued or renewed would be met. *Id.* at *5. The court further found that even if the amendment did not constitute a new policy, it fell under the language of the first statute, which applied to amended policies. *Id.* Accordingly, the Court found that Unum's discretionary clause was invalid under Texas law, and applied the default de novo standard of review to the claimant's case. *Id.*

The court in *Mantica v. Unum Life Ins. Co. of Am.*, No. RDB-18-0632, 2019 WL 1129438, at * 6–7 (D. Md. Mar. 12, 2019), similarly found that the discretionary clause in Unum's disability policy was void under state law. There, a Maryland statute passed in 2011, with an effective date of October 1, 2011, prohibited the sale, delivery, or issuance for delivery of insurance policies that grant discretionary authority to the administrator. *Id.* at *7. Unum initially issued the policy in *Mantica* in 2009, but amended it with an effective date of January

1, 2014, after the implementation of Maryland's ban on discretionary clauses.  *Id.*  Although the court did not discuss the amendment in any detail, the court found the Maryland statute applicable to the policy.  *Id.*  Accordingly, the court declined to give deference to Unum's denial of benefits under the policy, and reviewed the decision under a de novo standard of review.  *Id.*

In *Price*, the court considered whether Unum's disability policy was subject to an Arkansas statute prohibiting insurers' discretionary authority, made applicable to policies for disability insurance "issued or renewed on and after March 1, 2013."  2017 WL 3567531, at *3 (citing Ark. Code 054.00.101-7).  The court rejected the claimant's argument that the policy's annual anniversary date constituted a renewal, and found that "[t]he Plan was issued with an effective date of January 1, 2002, and Amendment No. 19 gave the Plan an effective date of change of September 1, 2011."  *Id.* at *4.  The court observed that Amendment No. 19 to the plan would have been subject to the statute if it had been issued subsequent to the statute's effective date.  *Id.* at *3 n.6.  However, because it was not, the court reviewed Unum's denial of benefits for an abuse of discretion.[13]  *Id.* at *4.

Unum points to *Barrett*, 2012 WL 3544839, at *2, in which the court rejected the insured's argument that a policy amendment that post-dated an Illinois regulation prohibiting discretion-granting clauses constituted a renewal or issuance of the policy.  However, unlike

---

[13]      Again, while the court based its decision on the fact that the policy's annual anniversary date was not a "renewal," the court also noted that the amendment to the policy predated the statute's effective date.  *Price*, 2017 WL 3567531, at *3 n.6.  Had it been otherwise, the statute would have mandated de novo review.  In other words, if the amendment had postdated the statute, as in our case, the amendment would have been subject to the statute.

the language of Amendment No. 3 here, the amendment in *Barrett* was in fact an amendment—it changed a discrete part of the policy—the definition of a certain class of employees covered by the policy. *Id.* The Illinois regulation only applied to policies issued or renewed after the rule's effective date, and just as Unum argues here with respect to Minnesota insurance law, the court noted that other Illinois Code provisions referred to contracts "issued, amended, . . . or renewed" on or after the effective date. *Id.* Importantly, however, the court observed that Illinois law might view amendments as renewals, but did not do so here, where, among other things, a discrete term of the subsequent policy had in fact been changed. *Id.*

It is true that several Minnesota insurance statutes use the word "amend," along with "issue" or "renew," as Defendant notes. *See* Minn. Stat. § 62A.21, subd. 3; Minn. Stat. § 62C.142. However, the Court's focus here is on the plain language of the Policy, which is interpreted "according to plain, ordinary sense." *Eng'g & Constr. Innovations*, 825 N.W.2d at 704–05 (citing *Carlson v. Allstate Inc. Co.*, 749 N.W.2d 41, 45 (Minn. 1977)). Amendment No. 3 is a part of the Policy that the Court must interpret and to which it must "give meaning." *Harris*, 357 F.3d at 825. Unlike the limited, discrete change to the policy in *Barrett*, Amendment No. 3 did not change this Policy at all. Rather, it "replaced" "the entire policy." (LTD at 341.) The Court finds that in this context, the plain, ordinary meaning of "replac[ing]" "the entire policy" is synonymous with renewing the policy, as the new Policy actually took the place of the former one. As applicable here, Merriam Webster's online dictionary defines "replace" as "[t]o take the place of especially as a substitute or successor," and "[t]o put something new in the place of." Merriam-Webster, https://www.merriam-

webster.com/dictionary/replace (last accessed Jan. 8, 2021).   Similarly, Dictionary.com

defines "replace" as "to assume the former role, position, or function of; substitute for (a

person or thing); to provide a substitute or equivalent in place of."   Dictionary.com,

https://www.dictionary.com/browse/replace (last accessed Jan. 8, 2021).

Moreover, in terms of its operative effect, this amendment did not actually "amend,"

that is, make any discrete changes to the Policy—rather, it replaced the entire Policy.  If the

Court were to find that this wholesale replacement of the Policy does not constitute the

renewal of the Policy simply because Unum labeled it an "amendment," insurers such as

Unum could easily skirt Minn. Stat. § 60A.42 through clever wordsmithing.  *See Kaferly v.*

*Metro Life Ins. Co.*, 189 F. Supp. 3d 1085, 1094 (D. Colo. May 31, 2016) ("[T]his Court

declines to apply a rule of law that would allow insurers to evade the obvious purpose of [an

analogous Colorado statute] by means of clever drafting.")  Accordingly, the Court finds that

the plain, ordinary meaning of Amendment No. 3, which replaced the entire Policy,

constitutes the renewal of the Policy.

Unum also argues that the term "issued" is "commonly understood to refer to new

policies," relying on *Sutherland*, 464 N.W.2d at 153.  In *Sutherland*, the Minnesota Court of

Appeals considered whether an insured was covered under certain amendments to

Minnesota's No-Fault Act, applicable to policies "issued" or "renewed" after September 30,

1985.  *Id.* at 152.  The court examined the language and operative effect of the automobile

insurance policy in question, which lacked the specific term "issue," (as well as the terms

"amend" or "replace," at issue here), and made no reference to any provision for renewal,

continuation, or expiration.  *Id.* at 153.  Because the policy stated that it "began" on a certain

53

date, the court construed it to show the insurer's intent to issue a new policy each time a new declaration sheet was delivered. *Id.* Plaintiff does not argue here that the Policy renewed or was issued anew on each anniversary date—an argument unsuccessfully advanced by the claimant in *Price*, 2017 WL 3567531, at *3. In any event, the Court focuses on the plain language of the Policy, just as the court in *Sutherland* did, and finds that replacing the Policy in its entirety was, in essence, renewing the Policy.

The Court further notes the Ninth Circuit's decision in *Stephan*, 697 F.3d at 926, which also involved a policy amendment issued by Unum that stated "[t]he entire policy is replaced by the policy attached to this amendment." *Id.* In *Stephan*, Unum explained that it used the "amend and replace" language to prevent confusion for policyholders, by placing all of the policy information in a single document, thus sparing policyholders from having to read both the policy and all amendments. *Id.* The Ninth Circuit was asked to determine whether "renew and replace" was the equivalent of "issuing" a new policy or "renewing" an existing policy for purposes of deciding whether a particular settlement agreement applied to the case. *Id.* at 925–28. The court found that the policy constituted a renewal. *Id.* Given the identical language in Amendment No. 3 here, written by the same insurer, the Court finds *Stephan* persuasive.

Accordingly, for all of these reasons, the Court finds it is proper to review Unum's denial of LTD benefits under a de novo standard of review, *Firestone Tire & Rubber Co.*, 489 U.S. at 115, because Minn. Stat. § 60A.42 renders the Policy's discretionary provision void.

### 3. De Novo Review of Unum's Denial of LTD Benefits

Under a de novo standard of review, the Court must make an independent decision

about benefits, affording no deference to the plan administrator's decision.[14]  *See Firestone*, 489 U.S. at 112.   Therefore, the Court does not consider whether "some evidence" or "substantial evidence" supported the administrator's decision, but rather "'whether the plaintiff's claim for benefits is supported by a preponderance of the evidence based on the district court's independent review.'"  *Michael v. Am. Int'l Grp., Inc.*, No. 4:05CV02400 ERW, 2008 WL 4279582, at * 17 (E.D. Mo. Sept. 15, 2008) (quoting *Niles v. Am. Airlines, Inc.*, 269 Fed. App'x 827, 832 (10th Cir. 2008)).  The plaintiff bears the burden of establishing disability, within the meaning of the plan.  *Lapidus v. Life Ins. Co. of N. Am.*, 413 F. Supp. 3d 867, 876 (E.D. Mo. 2019) (citing *Michael*, 2008 WL 4279582, at * 17).

Under the Policy, a claimant is disabled if he is unable to perform the material and substantial duties of his regular occupation due to sickness or injury, and has had a 20% or more loss in his indexed monthly earnings due to the same sickness or injury.  (LTD at 357, 373.)   The parties do not dispute that Kaminski had a 20% or more loss in his indexed monthly earnings due to his medical conditions.  Nor does Kaminski appear to dispute Unum's interpretation of his "regular occupation" as a "Buyer," nor the physical demands that Unum identified for that occupation.  Again, Unum interpreted the physical demands of the occupation as "Sedentary work:  Mostly sitting, may involve standing or walking for brief periods of time, lifting, carrying, pushing, pulling up to 10 pounds occasionally.  The duties of this occupation would allow for changes in position for brief periods of time throughout

---

[14]     The Eighth Circuit has observed that under a de novo standard of review, a district court has some discretion to allow the parties to supplement the record.  *Walke*, 256 F.3d at 840 n.1.  However, Kaminski did not seek to supplement the record here, and the Court finds the record is sufficient to review the denial of benefits.  *Id*.

the day." (LTD at 728.)  In addition, the physical demands of keyboard work required for the position "would require frequent (up to 2/3 of the work day) keyboard use to enter data and prepare reports.  The occupation would not type (keyboard) at a production rate or with precision such as would be expected of typists, data entry clerks, and similar." (LTD at 718.) As there appears to be no dispute concerning the physical requirements of the position, the Court focuses on whether Plaintiff was disabled from performing those physical requirements, under the terms of the Policy.

### a.  Previous Payment of Benefits

Of particular significance to the Court's review is the fact that Unum had previously approved Kaminski for LTD benefits as recently as January 2016, (LTD at 671), and STD benefits from October 25, 2016 through April 22, 2017.  (*Id.*)  "[I]n determining whether an insurer has properly terminated benefits that it initially undertook to pay out," the Eighth Circuit has noted that "it is important to focus on the events that occurred between the conclusion that benefits were owing and the decision to terminate them." *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 590 (8th Cir. 2002) (citing *Walke*, 256 F.3d at 840) (remanding to district court where records showed, on de novo review, that it was "highly probable" that claimant was still entitled to benefits).  The Eighth Circuit did not suggest "that paying benefits operates forever as an estoppel so that an insurer can never change its mind." *Id.* at 589.  But in *McOsker*, the Eighth Circuit stated that "unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments." *Id.*; *see also Hairston v. Loctite Corp.*, No. 4:05CV01141 JLH, 2006 WL 568326, at *8 (E.D.

Ark. Mar. 7, 2006) (stating that "a termination of benefits requires a significant change in the information available to the insurer between the granting and the terminating of benefits.").

As Unum notes, this is not a case in which it was in the midst of providing LTD benefits, then decided to discontinue those same payments. However, the Court finds that the Eighth Circuit's guidance in *McOsker* is nonetheless instructive under these facts. The underlying medical records supporting Unum's STD and LTD disability determinations were nearly identical, and Unum's definition of "disability" was identical in all material respects under both plans. (*Compare* STD at 283 ("You are considered disabled under this Plan if the Claim Administrator (in its sole discretion) determines that [:] [(1)] You are limited from performing the material and substantial duties of your regular occupation with the Employer due to your sickness, injury or pregnancy[;] and [(2)] You have a 20% or more loss in regular payroll period Covered Earnings due to that same Sickness, Injury or pregnancy") *with* LTD at 357 ("You are disabled when Unum determines that[:] [(1)] you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and [(2)] you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury."). And, importantly, Unum acknowledges that the physical disability supporting Unum's award of STD benefits—chronic pain—was the same physical disability supporting Kaminski's LTD claim. (*Compare* STD at 11, 563 (approving STD benefits through April 2017, citing Plaintiff's chronic nerve pain and history of "traumatic spinal cord injury that required multi level fusion") *with* LTD at 513 (stating in reviewer's background notes that Plaintiff suffered from "chronic neck pain, cervical spinal cord injury," and that following his diving accident, "his nerve pain has progressively gotten worse since then.")

*and* LTD 542 (denying Kaminski's LTD claim, and noting that his claim was based on "worsening chronic neck pain, neuropathic pain and cervical spinal cord injury after a diving accident.").)

In *McOsker*, the Eighth Circuit's guidance is to focus on the events that occurred between the decision that benefits were owing (here, in April 2017) and the decision to terminate them (in May 2017). 279 F.3d at 590. While the Court focuses on that period of time in particular, the records from the larger period between November 1, 2016 through May 2017 are also informative.[15] In awarding STD benefits between November 1, 2016 and April 22, 2017, Unum conducted a thorough review, during which Unum claims administration staff reviewed the medical information submitted by Dr. Engineer, (STD at 44–45), consulted with Dr. Engineer's office staff, (STD at 77), interviewed Kaminski, (STD at 52, 57, 88–89), obtained employment information from LOL, (STD at 58), collected additional office notes from Dr. Engineer, (STD at 102–06), and determined that Kaminski was entitled to STD benefits through November 21, 2016. (STD at 92–94.) Thereafter, Unum approved extensions of STD benefits through the maximum extension date of April 22, 2017. (STD at 563, 567, 571–72.) Unum's staff also reviewed the records from Kaminski's 2015 evaluation for chronic pain at Craig Hospital. (STD at 259–71.) In addition, Unum's claims administration reviewers conducted several roundtable reviews concerning Plaintiff's STD claim with Unum's clinical, vocational and benefits staff. (STD at 16, 187–89, 272–73, 468, 524–25.) The nearly 600-page file for Kaminski's STD benefits from November 1, 2016

---

[15] Unum does not substantially disagree. At oral argument, its counsel encouraged the Court to direct its attention to records from January through April of 2017.

through April 22, 2017 reflects a thorough review process.

Moreover, because Kaminski sought to receive LTD benefits when his STD benefits expired on April 22, 2017, Unum's STD file and LTD file contain nearly identical medical records. The LTD file contains two more recent records from April 26, 2017 and May 24, 2017 that are not found in the STD file due to the expiration of STD benefits on April 22, 2017. The STD plan had a 180-day maximum period of benefits, (STD at 142), while the LTD Policy had a 180-day elimination period, during which time the claimant was to meet a continuous period of disability in order to be eligible for LTD benefits. (LTD at 357, 372.) Those 180 days overlapped. There is no evidence showing that Unum's LTD reviewers considered significantly different medical records than the STD reviewers for this overlapping time period. Unum conclusively determined that Kaminski was "disabled" for purposes of STD benefits awarded from November 1, 2016 to April 22, 2017, yet later determined that during the same period of time, he was no longer "disabled" for purposes of LTD benefits.

As to the two newest records in the LTD file that are not part of the STD file, the information in those records is not significantly different from the information on which Unum found Kaminski eligible for STD benefits, nor do they reflect a significant change in his condition. *McOsker*, 279 F.3d at 589; *Hairston*, 2006 WL 568326, at *8. Dr. Engineer reported in her April 26, 2017 office note that Kaminski's condition was the same, and in her May 24, 2017 office note, she stated that his condition had worsened due to a low back injury, but was otherwise the same. (LTD at 484–85; 518–20.)

It is true that the results of the PAT—the December 2017 test that sought to measure Kaminski's physical abilities—were included in his LTD appeal, and were not before Unum

when it awarded his STD claim.  But the results of the PAT are of limited value because time constraints precluded any testing of Kaminski's endurance for sedentary work.  (LTD at 655.)  In any event, the results of the PAT did not weigh against Kaminski's reports of disabling pain or show significantly changed circumstances in Unum's favor.  *See Lapidus*, 413 F. Supp. 3d at 884 (finding results of PAT and [Functional Capacity Evaluation] were "not so conclusive as to weigh against Plaintiff's claims of debilitating pain, and [did] not clearly indicate changed circumstances in Defendant's favor.").  To the contrary, Mr. Hovde, who conducted the PAT, observed that "[Kaminski's] employability related to office work is largely affected by intractable pain," and he found, as a result of testing, that Kaminski presented with widespread sensory impairment, impaired balance and coordination, and upper extremity and lower extremity clonus, "impaired dexterity and clonus in his wrists and forearms that impairs finger/hand dexterity," and that he walked below average normal speed and showed mild gait impairment.   (LTD at 651, 654–55.)

The earlier medical records in both the STD and LTD files confirm that Kaminski's chronic pain condition remained unchanged.  In office visits from September 2016 through May 2017, Dr. Engineer consistently noted that:  (1) Kaminski suffered from chronic neck pain, status post cervical fusion and spinal cord injury, and neuropathic pain; (2) the pain frequency was described as "constant," with the pain trend generally "staying the same"; and (3) he was unable to perform even sedentary work, as he could not sit or stand for any significant length of time due to his severe  chronic pain.  (LTD at 106, 135, 143, 303–04, 485, 520; STD at 103, 105, 135, 146, 158, 164, 170, 214.)

In fact, Unum's reviewer, Dr. Cowell acknowledged that "[t]he insured's neurological

deficits related to the [2008 spinal cord] injury have been static in nature." (LTD at 711.)  In Unum's denial of appeal letter, it conceded that Kaminski's condition had not changed between the start of his STD leave in the fall of 2016 through the date of his appeal, stating

> There is no new neurological condition or progression of any previous condition that suggests there was a change in functional abilities during October 24, 2016 through the elimination period of April 22, 2017 and ongoing that would limit or restrict [Kaminski] from performing full time sedentary duties. Mr. Kaminski's physical abilities have rem[a]ined stable.  His chronic pain below the C5 level is chronic, requires ongoing monitoring, and pharmacological support, however, would not limit him from performing his regular occupation.

(LTD at 731).

Without any evidence showing a significant improvement in Kaminski's ability to perform full-time sedentary work, Unum determined that the condition that rendered Kaminsky "disabled" between November 2016 and April 2017, no longer rendered him "disabled."  In *Christoff v. Unum Life Ins. Co. of Am.*, No. 17-cv-3512 (DWF/KMM), 2019 WL 4757884, at *8 (D. Minn. Sept. 30, 2019), the court found that where the insurer—also Unum—had approved a claimant for benefits, but then denied his claim again a short time later, with no apparent change in condition, "the brief period between the last time that [the claimant's] claim was approved, paired with the very recent analyses of his medical records that considered up-to-date submissions regarding his activities and his doctors' assessments, heavily weigh against the propriety of Unum's latest review of [the claimant's] benefits."). Here, the only changed circumstance of note was that Kaminski's employer, LOL, was responsible for paying STD benefits, (STD at 140), and did so, while Unum was responsible for paying LTD benefits, and declined to do so.  (LTD at 347.)  The Court finds that Unum's

61

prior approval of Plaintiff's STD claim, under the same definition of "disability" as the LTD Policy, with no evidence showing a significant change in Kaminski's condition or in the medical records for review, "weigh[s] against the propriety of [Unum's] decision" to deny LTD benefits. *McOsker*, 279 F.3d at 589.

### b. Analysis of the Medical Evidence

"While an ERISA plan administrator need not accord special deference to a treating physician's opinion, . . . an administrator may not 'arbitrarily refuse to credit a claimant's reliable evidence, including a treating physician." *Willcox v. Liberty Life Assur. Co. of Boston*, 552 F.3d 693, 701 (8th Cir. 2009) (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 824 (2003)).   Throughout Kaminski's treatment with Dr. Engineer, she consistently found that his chronic pain rendered him unable to perform full-time sedentary work, as he was unable to perform work that involved any significant sitting or standing. (LTD at 304, 486, 520, 524; STD at 214.)   Dr. Engineer was well-qualified to offer this opinion, as she is a physiatrist—a physical medicine and rehabilitation specialist who treats patients with neurological and musculoskeletal disorders.  Not only do Dr. Engineer's detailed records support her opinion, but the team of evaluators at Craig Hospital who performed Kaminski's 2015 interdisciplinary evaluation likewise supported his disability claim.  (LTD at 596.) These doctors and therapists with directly relevant specialties included a physical therapist, occupational therapist, neurology nurse practitioner, consulting neurologist, and neurosurgeon. (LTD at 588–601.)

While plan administrators are not *required* to defer to treating physicians over reviewing physicians, some courts have observed that assessing pain or other conditions with

subjective symptoms may be best informed by physicians who see the claimant regularly and make in-person observations.  *See, e.g.*, *Medefesser v. Metro. Life Ins. Co.*, No. 6:18-cv-00041-MK, 2019 WL 6481794, at *11 (D. Ore. Sept. 5, 2019) (noting that paper reviewers could not have "observed how the fluctuating degree of pain affects Plaintiff's ability to function, thus could not have appropriately assessed the credibility of her reports of pain.")*, adopted*, 2019 WL 6467818 (D. Ore. Dec. 2, 2019); *Shaw v. Life Ins. Co. of N. Am.*, 144 F. Supp. 3d 1114, 1129 (C.D. Ca. 2015) ("The credibility of physicians' opinions turns not only on whether they report subjective complaints or objective medical evidence of disability, but on (1) the extent of the patient's treatment history, (2) the doctor's specialization or lack thereof, and (3) how much detail the doctor provides supporting his or her conclusions.") (citation omitted).  As Plaintiff notes, "[s]ome disabling conditions are not amenable to substantiation through objective medical evidence, and ERISA plans may not deny benefits by requiring such evidence where it cannot exist."  *Bowlin v. Prudential Life Ins. Co.*, No. 8:16-cv-00937-JLS (PLA), 2018 WL 1441175, at *11 (C.D. Ca. Mar. 22, 2018).  Here, the underlying source of Plaintiff's chronic pain, and the existence of his chronic pain, is not in dispute.

Moreover, the opinions of Plaintiff's treating physicians correspond with Kaminski's own reports of chronic pain and with his treatments.  And his history of care for his spinal cord injury and resulting chronic pain fully supports his claim.  While Unum argues that the lack of additional MRIs or similar testing fails to support the severity of Kaminski's pain, given that the resulting pain was diffuse in his extremities, the lack of additional MRIs was not surprising.  As reflected in the findings of the neurosurgeon who conducted Kaminski's

2015 MRI at Craig Hospital, the etiology of his chronic pain was mostly musculoskeletal, and did not warrant surgical intervention.  (LTD at 600.)  When Kaminski discontinued taking narcotics for pain management, he began a more conservative course of treatment, under the guidance of a physical medicine specialist.  His treatment included occupational therapy, physical therapy, acupuncture, aqua therapy, and different medications.  The fact that he took a variety of medication to address his pain is also further objective evidence of his disability.  And, in Dr. Folkening's conversation with Dr. Engineer, she noted that following a visit with Kaminski two days earlier, she had referred him to a new pain clinic.  (LTD at 514–15.)  While Unum argues that a lack of objective evidence supports its denial of LTD benefits, it is telling that none of Unum's medical reviewers interviewed or examined Kaminski in connection with his LTD claim, nor did they schedule an IME.

While an insurer is free to obtain a reviewer's opinion, an insurer may not accept such a report "without considering whether its conclusions follow logically from the underlying medical evidence."  *Willcox*, 552 F.3d at 700–01 (citation omitted).  Unum's reliance on alleged "inconsistencies" between Kaminski's activities and his claimed disability was based on anecdotal evidence of limited quality and relevance.  The Policy defines "disability" relatively narrowly, stating, in relevant part, that you are disabled when "you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury."  (LTD at 357.)  Unum interpreted Kaminski's regular occupation as "Buyer," which involved the following physical demands:  "Sedentary work:  Mostly sitting, may involve standing or walking for brief periods of time, lifting, carrying, pushing, pulling up to 10 pounds occasionally.  The duties of this occupation would allow for changes in position

for brief periods of time throughout the day." (LTD at 728.) Dr. Engineer's May 24, 2017 restrictions and limitations were that Kaminski was unable to do even sedentary work. (LTD at 520.)

Among the activities that Unum identified as inconsistent with Kaminski's disability were swimming, "walking dogs 5–7 miles a day," "biking," traveling and driving. (LTD at 538.) Kaminski's participation in these activities, however, is almost entirely unrelated to the physical demands of his occupation, and Dr. Engineer's assessment that he was unable to do sedentary work. Swimming, walking, and biking have nothing to do with Kaminski's ability to perform full-time work that consists of "mostly sitting." In addition, Kaminski's treating providers encouraged his physical activity, finding it therapeutic and pain-alleviating. In fact, his providers referred Kaminski to aquatic therapy, in addition to the swimming that he did at his parents' home. (LTD at 157.) To find that Kaminski was able to work because he followed his doctors' medical advice to exercise was certainly an erroneous determination.[16]

---

[16]     Again, the Court finds that Kaminski's walking and biking are not relevant to his ability to meet the physical demands of a job that Unum defined as "sedentary" and consisted of "mostly sitting." (LTD at 728.) Moreover, as to the reference in Kaminski's October 4, 2016 occupational therapy record that he "walked his dogs 5–7 miles a day," (LTD at 117), the Court agrees with Plaintiff that this was likely an error in transcription by the occupational therapist. Kaminski explained in his appeal that he likely estimated that he walked his dogs 5–7 minutes a day." (LTD at 644.) The notation in this particular record is inconsistent with the rest of the information in the same record. At that same appointment, Kaminski reported "decreased function with daily activities due to nerve pain down both arms and generalized pain throughout his body as if all his muscles are tense all the time." (LTD at 117.) The therapist reviewed the results of Kaminski's Pain Self Efficacy Questionnaire and found that his results suggested he experienced "moderate to severe disability and impact on daily functioning due to pain symptoms." (LTD at 119.)

     The limited references to bicycling in a January 31, 2017 behavioral health record gave no indication of frequency or duration of activity, but merely noted Kaminski's forms

To the extent that driving and traveling are considered partly sedentary activities, the medical records indicate that while Kaminski could drive, he found it difficult, and sometimes impossible.  (LTD at 151, 155–56 (noting in February 2017 occupational therapy and physical therapy records that Kaminski's pain affected his ability to attend occupational therapy sessions, as he was unable to get out of his home and drive, and listing "driving" as a pain-aggravating factor); 332 (noting in July 13, 2015 Craig Hospital record that, at his worst point, Kaminski was not able to drive); 390 (reporting that Kaminski limits his driving, and family members help with driving).)  The fact that Kaminski was able to sit in a car and drive, on some occasions, for an unknown duration, does not greatly illuminate the question of whether he could perform any of the essential duties of a "Buyer" —none of which involved driving.  (LTD at 728.)  Nor was Kaminski's participation in a one-off family trip to Europe, or a visit to his family cabin in Michigan, indicative of his ability to work in a full-time sedentary job.[17] *See Frerichs v. Hartford Life & Acc. Ins. Co.*, 875 F. Supp. 2d 923, 948 (D. Minn. 2012) (finding evidence of a one-off road trip was of little value, as it was outside the norm of the claimant's daily activities); *see also Holoubek v. Unum Life Ins. Co. of Am.*, No. 06-C-121-S, 2006 WL 2434991, at *11 n.4 (W.D. Wisc. Aug. 22, 2006) (finding certain evidence of

---

of exercise,  which included "riding his bicycle (sensitive to angle sits)." (LTD at 62.)  An earlier record from the Craig Hospital in July 2015 noted that Kaminski "bik[ed]for short durations," yet the treating providers at Craig Hospital supported Kaminski in his efforts to obtain STD benefits because "sitting all day" in Kaminski's "computer/desk job" was "causing his pain." (LTD at 329, 596.)

[17]     Moreover, while Kaminski was able to take the family trip to Europe, in advance of the trip, he questioned his ability to go due to nerve pain.  (LTD at 112).  In addition, the records state that he found the plane trip difficult and the beds uncomfortable, although walking helped ease his pain.  (LTD at 130, 528.)

little value because it failed to demonstrate that plaintiff could sustain such a level of activity on a continuous basis).

The Court therefore finds that Unum erroneously relied on evidence that was irrelevant to the question of the physical requirements of the job and the most recent restrictions and limitations identified by Dr. Engineer.  This is not to say that Unum's reviewers were necessarily unqualified, but Dr. Engineer's opinions were based on relevant expertise and many months of treating Kaminski, unlike Unum's physician reviewers.  Unum did not schedule an in-person medical evaluation of Kaminski, but instead relied entirely on a paper review of his medical records.  Even among the reviewers, however, their findings were inconsistent.  Reviewing Kaminski's history with Dr. Engineer in a telephone call, Dr. Folkening correctly observed that after Kaminski decreased or discontinued use of one or more medications because of adverse effects, this intensified his pain, and caused him to stop working. (LTD at 514.)  Yet Dr. Cowell found that his discontinuation of narcotics and positive response to occupational therapy showed that his pain was not so severe as to preclude work in a sedentary job.  (LTD at 711.)

When Dr. Folkening noted Kaminski's participation in various activities was inconsistent with his ability to tolerate even sedentary activity, Dr. Engineer responded that Kaminski forced himself to stay active, although such activity was not pain-free, and often resulted in fatigue.  (LTD at 514.)  Yet Dr. Folkening found Dr. Engineer "not credible," because she had recently examined Kaminski and reported that he did not present with immediate evidence of extreme pain.  (LTD at 514–15.).  Dr. Cowell likewise found observations in the office visit records failed to show that Kaminski suffered from

"significant pain behavior." (LTD at 712.) Both doctors disregarded record evidence noting that, in terms of chronic physical pain, Kaminski had good days and "horrible" days, (LTD at 396), that he could not treat with doctors on days when his pain was severe and canceled appointments, (STD at 170), that he "toughed it out" with his pain in order to postpone his disability leave, (LTD at 394), and that simply because he engaged in activities did not mean that it was not painful to do so. (LTD at 514.) Moreover, Dr. Engineer was well aware of Kaminski's physical activities, as reflected in her notes, and nevertheless found him unable to perform his job duties. And, unlike Unum's reviewers, Dr. Engineer had the opportunity to personally evaluate Kaminski over many months and therefore "was in a better position to understand both the activities in which Plaintiff engaged and his occupational limitations." *Bowlin.*, 2018 WL 1441175, at *12 (noting that treating physician, who had the benefit of treating the plaintiff and was in a better position to understand her activities and limitations, was well aware of plaintiff's activities, and consistently opined that plaintiff was unable to perform her job duties).

Moreover, Unum's reviewers occasionally cherry picked the records to identify general observations about Kaminski's presentation at office visits, to support their findings regarding disability. Those observations are often taken out of context and are thus misleading. In several of the behavioral health records, for instance, Unum notes that the medical provider found that Kaminski was in "no acute distress" or in "no apparent distress." But these comments are made in a section of the report entitled "mental status exam," which contain general notes about his vital signs, speech, eye contact, posture, mood and affect. (*See, e.g*., LTD at 87.) Since behavioral health specialists were not

treating Kaminski's chronic physical pain, their findings to this effect are not particularly relevant to whether his chronic physical pain disabled him from performing sedentary work.  And importantly, many of these same records in fact reflect that he suffers from chronic pain.  (LTD at 88.)

Other references to Kaminski's lack of "apparent distress" appear in notes from office visits with Dr. Engineer in her "general" baseline findings that include notations about blood pressure, weight, and height as well as notes regarding "neck," "cardiovascular," "lungs," "HEENT," and "extremities."  (*See, e.g.*, LTD at 105.) However, in the same records, her examination notes, assessment, findings, and treatment plan all address the severity of his chronic pain, in detail.  (*See, e.g.,* LTD at 105–10.)  And, based on her examination and assessment of Kaminski, Dr. Engineer consistently held the opinion that he was not able to perform full-time sedentary work.

For the reasons discussed above, the Court finds that the preponderance of the evidence demonstrates that Plaintiff's chronic pain was persistent, disabling, and ongoing during the relevant time period. Kaminski has shown, by a preponderance of the evidence, that his inability to sit for full-time work rendered him disabled from performing his "mostly sedentary" position of "Buyer."  The opinions of his treating physicians fully support his disability claim.  In contrast, the opinions of Unum's paper reviewers are inconsistent and poorly supported, including Dr. Cowell's ultimate opinion that Kaminski could perform full-time sedentary work if he changed position for a period of five minutes, on an hourly basis, and could perform keyboarding work up to 2/3 of the work day, despite acknowledging his "slow and effortful" use of his upper extremities.  (LTD at 716–17, 719–20.)  The Court thus

finds that Kaminski has established that Unum's decision to not pay LTD disability benefits was erroneous under the terms of the Policy and in light of the evidence presented.

### 4.   Award of Benefits

ERISA provides for courts to award benefits to a prevailing plaintiff in a civil action challenging the insurer's denial of benefits.[18]   29 U.S.C. § 1132(a)(1)(B).

Unum argues, however, that any benefits awarded to Kaminski must be confined to the 24-month "regular occupation" period, limited in duration through the date of the appeal decision, and subject to a reduction for estimated SSDI benefits potentially available to Plaintiff.  (Defs.' Mem. at 30–33.)

### a.   Calculation of Benefits

The Policy provides that after 24 months of LTD payments following the 180-day elimination period, in order to continue receiving benefits, the insured must demonstrate the inability to perform any "gainful occupation," as opposed to the insured's "regular occupation."  (LTD at 357.)  "Gainful occupation" is defined as "an occupation that is or can be expected to provide you with an income at least equal to 80% of your indexed monthly

---

[18]     As noted in *Christoff*, 2019 WL 4757884, at *10, the Eighth Circuit has also advised that where the insurer has failed to provide a full and fair review, an appropriate remedy is remand for reconsideration.  (citing *Brown v. J.B. Hunt Transp. Servs., Inc*., 586 F.3d 1079, 1087 (8th Cir. 2009)).  But when a claim has been pending for some time, it may also be appropriate for the court to enter judgment in the claimant's favor rather than remanding the claim, as remand would further delay an award of benefits.  *Id*. (citing *Chronister v. Unum Life Ins. Co. of Am*., 563 F.3d 773, 777 (8th Cir. 2009)).  In addition, remand may be unnecessary when there are no meaningful questions of fact to consider.  *Id*. (citing *Sepulveda-Rodriguez v. MetLife Grp., Inc*., 936 F.3d 723, 731 (8th Cir. 2019)).  As in *Christoff*, the Court finds that the record here is complete and there is no need for further proceedings, which would only delay an award of benefits.

earnings within 12 months of your return to work." (LTD at 373.)

Unum states that a 24-month award of LTD payments, with a starting date of April 23, 2017, would expire as of April 23, 2019. (Def.'s Mem. at 30–31.) Because it did not consider the "any gainful occupation" standard, Unum argues that this issue must be remanded so that it can make such a determination in the first instance. (*Id.* at 31.) Defendant further asserts, "For the same reason, benefits cannot be awarded through the date of judgment and instead should be awarded only up to the date that Unum denied Plaintiff's appeal, which is February 9, 2018." (*Id.* at 32.)

Plaintiff disagrees, arguing that he is entitled to LTD benefits through the date of judgment. (Pl.'s Opp'n [Doc. No. 31] at 28–32.) Alternatively, Plaintiff asserts that if the change in the definition of disability from "own occupation" to "any occupation" would materially change the result, then a retroactive benefit award should at least extend through April 23, 2019, when the 24-month period during which he was unable to perform his "own occupation" would have ended. (*Id.* at 32.)

The plain language of the Policy states that after 24 months of LTD benefits, a beneficiary must demonstrate the inability to perform any gainful occupation. (LTD at 357.) While Plaintiff cites *Chronister v. Unum Life Ins. Co. of Am.*, 563 F.3d 773 (8th Cir. 2009), and *Neaton v. Hartford Life & Accident Ins. Co.*, 517 F. App'x 475 (6th Cir. 2013), neither court addressed a policy change in the definition of "disabled" from being unable to perform one's own occupation to being unable to perform any gainful occupation. Dr. Engineer did not preclude Kaminski from performing all work, and Kaminski himself considered the possibility of changing positions within LOL, or working in a non-sedentary field altogether.

The facts here are therefore unlike other authority on which Plaintiff relies, *Lavery v. Restoration Hardware Long Term Disability Benefits* Plan, 937 F.3d 71, 84–85 (1st Cir. 2019), and *DuPerry v. Life Ins. Co. of N. Am., Inc.*, 632 F.3d 860, 876 (4th Cir. 2011), in which courts found that the record overwhelmingly showed that the plaintiff was permanently disabled from performing any work. Unum has made no determination on the question of whether Kaminski is unable to perform the duties of "any gainful occupation."

Because the Court finds that Kaminski was entitled to LTD benefits, which would have expired 24 months after April 23, 2017, the Court awards retroactive LTD benefits to Kaminski through April 23, 2019. The Court declines to award benefits only up to the date that Unum denied Plaintiff's appeal, February 9, 2018. If Plaintiff wishes to obtain benefits after the 24-month benefits period, he must first apply to Unum.[19]

### b. LWOP Benefits

The Court reaches a similar conclusion with respect to Plaintiff's claim for LWOP

---

[19]    Regarding Unum's contention that it is entitled to determine the amount of an offset for any award of SSDI benefits, the Policy provides that when Unum determines that the claimant qualifies for SSDI benefits, Unum "can reduce" the LTD payments by that estimated amount. (LTD at 362–63.) However, the Policy states that LTD payments will not be reduced by the estimated amount of SSDI if the claimant applies for SSDI and appeals any denial of benefits as "Unum feels necessary," and signs a form promising to pay Unum any overpayment caused by an award. (LTD at 363.) Unum did not estimate the amount of any SSDI benefits covering the 24-month LTD benefit period, nor did Kaminski apply for SSDI. Now, over 20 months after the expiration of the 24-month benefit period that ended in April 2019, Unum seeks to determine the amount of SSDI that Kaminski might have received if he had applied. Given that the Policy provides for no deduction as long as the claimant applies for SSDI and agrees to pay any overpayment, the Court orders Unum to award the LTD benefits, and for Kaminski to apply for SSDI and agree to repay any overpayment caused by an SSDI award.

benefits.[20]  As noted, because Unum found that Kaminski was ineligible for LTD benefits, it

likewise found him ineligible for LWOP benefits. (LWOP at 11.)

Unum's life insurance policy provided for a waiver of insurance premiums in certain

circumstances, stating:

> Your life insurance premium will be waived if you meet these conditions:
>
> - you are less than 60 and insured under the plan.
>
> - you become disabled and remain disabled during the elimination period.
>
> - you meet the notice and proof of claim requirements for disability while your life insurance is in effect or within three months after it ends.
>
> - your claim is approved by Unum.

(LWOP at 66.)

> Unum then defined "disability" as follows:
>
> You are disabled when Unum determines that:
>
> - during the elimination period, you are not working in any occupation due to your **injury** or **sickness**; and
>
>  - after the elimination period, due to the same injury or sickness, you are unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by training, education, or experience.

(LWOP at 67) (emphasis in original).

Because of the conjunctive use of "and" in Unum's definition of "disability," the Court

finds that to qualify for the LWOP benefit, Kaminski would need to demonstrate that he was

---

[20]     In the Complaint, Plaintiff requests "full reinstatement into coverage under the life insurance policy with full LWOP benefits." (Compl. ⁋ 52.)   However, his summary judgment motion focuses on the LWOP benefits.   Accordingly, the Court confines its analysis of the life insurance policy to whether Plaintiff is entitled to LWOP benefits.

disabled during the 180-day elimination period *and* that he was unable to perform the duties of any gainful occupation after that time.  (*Id.*; *see also* Def.'s Opp'n [Doc. No. 30] at 21–22.)  As noted, Unum did not previously determine whether Plaintiff was precluded from performing any "gainful occupation."  Just as the Court confines its review of LTD benefits to the 24-month period under the "regular occupation" standard, it finds that Plaintiff is not currently eligible for the LWOP benefit, as there is no evidence in the record under the "any occupation" standard, such that Unum's denial of LWOP benefits was unreasonable.[21]  However, since the Court disagrees with Unum as to the denial of LTD benefits under the "regular occupation" standard, it cannot conclude that Plaintiff would never be entitled to LWOP benefits under the "any occupation" standard.

### c.  Prejudgment Interest

Plaintiff also seeks prejudgment interest on any award of past due LTD benefits.  (Compl. ¶ 52(i).)  Interest is allowed on any money judgments recovered in district court and is calculated "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding."  28 U.S.C.A. § 1961.  While ERISA contains no express provision for prejudgment interest, "such an award is permitted under 29 U.S.C. § 1132(a)(3)(B) if a court finds it to be 'appropriate equitable relief.'"  *Christoff*, 2019 WL 4757884, at *11 (citing *Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1330 (8th Cir. 1995)).  Interest awarded to ERISA litigants is assessed according to the rate of interest provided under 18 U.S.C. § 1961.

---

[21]     Plaintiff states that Unum's denial of LWOP benefits constituted an abuse of discretion.  (Pl.'s Reply at 1–2.)

*Id.* (citing *Mansker*, 54 F.3d at 1331).  The Court finds an award of prejudgment interest on the amount of Plaintiff's LTD award is appropriate equitable relief.

Kaminski shall submit an affidavit calculating his LTD benefits for the 24-month period from April 23, 2017 through April 23, 2019, along with prejudgment interest, to which Unum may respond, as set forth below.

### d.  Attorneys' Fees and Costs

In an ERISA action, courts have the discretion to award a reasonable attorneys' fee and costs of the action to either party.  29 U.S.C. § 1132(g).  The Eighth Circuit has emphasized the remedial nature of ERISA in determining whether to award fees, stating:

> ERISA is remedial legislation which should be liberally construed to effectuate Congressional intent to protect employee participants in employee benefit plans. A district court considering a motion for attorney's fees under ERISA should therefore apply its discretion consistent with the purposes of ERISA, those purposes being to protect employee rights and to secure effective access to federal courts.

*Starr v. Metro Sys., Inc.*, 461 F.3d 1036, 1040 (8th Cir. 2006).

In exercising its discretion to award attorneys' fees, courts are to consider the following factors:

> 1)  the degree of culpability or bad faith of the opposing party; (2) the ability of the opposing party to pay attorney fees; (3) whether an award of attorney fees against the opposing party might have a future deterrent effect under similar circumstances; (4) whether the parties requesting attorney fees sought to benefit all participants and beneficiaries of a plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions.

*Martin v. Ark. Blue Cross & Blue Shield*, 299 F.3d 966, 969 n.4 (8th Cir.2002) (citing *Lawrence v. Westerhaus*, 749 F.2d 494, 496 (8th Cir. 1984)). The Eighth Circuit has held that

there is no presumption in favor of a fee award for prevailing plaintiffs in ERISA cases. *Id*. at 969–72.

Here, while the Court does not make any finding of bad faith on the part of Unum, it could have exercised greater care in reviewing the record.  Moreover, Unum has the ability to pay attorneys' fees and such an award may have a future deterrent effect.  Accordingly, the Court, in its discretion, awards attorneys' fees and costs to Kaminski.  To determine the amount to which he is entitled, Kaminski shall submit an affidavit documenting his reasonable fees and costs, to which Unum may respond, as set forth below.

### III.    ORDER

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion for Summary Judgment [Doc. No. 17] is **DENIED**;

2. Plaintiff's Motion for Summary Judgment [Doc. No. 23] is **GRANTED**. The Court awards Plaintiff damages in the amount of his unpaid LTD benefits from April 23, 2017 through April 23, 2019, with interest;

3. Plaintiff shall submit within 30 days of the date of this Order an affidavit documenting his total benefit award, along with prejudgment interest on that award, and his reasonable attorneys' fees and costs; and

4. Defendant  may submit a responsive affidavit 10 days later.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  January 8, 2021                         s/Susan Richard Nelson
                                                SUSAN RICHARD NELSON
                                                United States District Judge